Filed 2/10/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DEPARTMENT OF FISH AND WILDLIFE, <br><br> Defendant and Respondent. | C072486 <br><br> (Super.Ct.No. 06CS01451) |
| CALIFORNIA ASSOCIATION FOR RECREATIONAL FISHING, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DEPARTMENT OF FISH AND WILDLIFE, <br><br> Defendant and Respondent. | C072790 <br><br> (Super.Ct.No. 34-2010-80000588CUWMGDS) |

1

CALIFORNIANS FOR ALTERNATIVES TO TOXICS et al.,

        Plaintiffs and Appellants,

v.

DEPARTMENT OF FISH AND WILDLIFE,

        Defendant and Respondent.

C073011

(Super.Ct.No. 34-2010-80000566CUWMGDS)

APPEAL from a judgment of the Superior Court of Sacramento County, Lloyd G. Connelly, Judge. Affirmed in part and reversed in part.

Environmental Law Clinic, Deborah A. Sivas, and Alicia E. Thesing for Plaintiff and Appellant Center for Biological Diversity.

Alston & Bird, Maureen F. Gorsen, Shiraz D. Tangri, Rebecca Harrington; Pacific Legal Foundation, M. Reed Hopper, Damien M. Schiff, Joshua P. Thompson, and Jonathan Wood for Plaintiff and Appellant California Association for Recreational Fishing.

Wild Earth Advocates and Julia A. Olson for Plaintiffs and Appellants Californians for Alternatives to Toxics et al.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Gavin G. McCabe, Randy L. Barrow, Russell B. Hildreth, and Marc N. Melnick, Deputy Attorneys General, for Defendant and Respondent.

Facing for the first time a requirement to review for environmental impacts its statutorily mandated fish hatchery and stocking enterprise that has been in operation for more than 100 years, California's Department of Fish and Wildlife (the Department) chose to use a program environmental impact report (EIR) to analyze the enterprise's impacts on a statewide basis. Instead of addressing impacts on specific locations the Department stocked, the EIR addressed the enterprise's continuing and potential impacts

2

on individual species that could be located at many locations. The EIR formulated, and the Department adopted, protocols and plans for discovering site-specific impacts at each of the nearly 1,000 water bodies the Department stocks and the 24 hatcheries it oversees, and it committed to mitigating the impacts discovered from those reviews. If, through using the protocols, the Department discovered impacts that were not addressed in the EIR, the Department committed to review and mitigate those impacts as required by environmental law. The Department addressed unavoidable impacts in a statement of overriding considerations.

Because the stocking and hatchery enterprise was ongoing and mandated by statute, the EIR considered the existing enterprise exclusive of any proposed mitigation measures as the environmental baseline and as the no project alternative. It did not evaluate an alternative that would cease all stocking and hatchery operations. In addition to the ongoing operations, the EIR evaluated the ongoing enterprise as proposed to be mitigated and a project that further curtailed mountain lake stocking as alternatives.

The EIR also reviewed other Department stocking programs that involve private fish vendors. The EIR proposed, and the Department adopted as mitigation measures, new qualification requirements and monitoring and reporting obligations private vendors would have to satisfy if they wanted to continue to participate in the stocking programs.

In these appeals, we address whether the EIR complies with the California Environmental Quality Act (Pub. Resources, § 21000 et seq. (CEQA)). We also address whether the Department's imposition of these mitigation measures on private fish vendors violated the requirements of the Administrative Procedure Act (Gov. Code, § 11340 et seq. (the APA)).

In case Nos. C072486 and C073011, plaintiffs, Center for Biological Diversity and Californians for Alternatives to Toxics et al., respectively, argue the EIR is flawed because it (1) did not perform site-specific review for each site in the state the Department stocks with fish; (2) deferred forming mitigation measures to the future

3

formulation of protocols and management plans; (3) relied on the current stocking enterprise as the environmental baseline; and (4) did not review a reasonable range of alternatives, including a no project alternative consisting of ceasing all hatchery and stocking operations. We disagree with the plaintiffs. Given the history, nature, and scope of the project under review, the Department did not abuse its discretion in the manner it organized the EIR, analyzed the project, and mitigated its numerous impacts. We affirm the trial court's judgment in these appeals.

In case No. C072790, plaintiff California Association for Recreational Fishing contends the Department violated the APA by imposing the qualification requirements and the monitoring and reporting obligations on private fish vendors without complying with the APA's notice and hearing procedures. We conclude each measure qualified as a regulation under the APA that the Department did not properly adopt as such. We reverse the trial court's judgment in this appeal.

FACTS AND PROCEDURAL HISTORY

Since the late 1800's, the State of California has constructed and operated fish hatcheries, and it has stocked millions of trout, salmon, and steelhead reared in those hatcheries into water bodies throughout the state. State statute mandates the Department implement and oversee this enterprise. (Fish & G. Code, §§ 1120, 1725 et seq., 13007.) [1] The Department stocks millions of pounds of fish each year at close to 1,000 locations.

Currently, the Department operates 14 trout hatcheries and 10 salmon and steelhead hatcheries throughout the state. The trout hatcheries raise fish for stocking in inland waters to provide recreational opportunities for anglers, and to conserve and restore native fish species. The salmon and steelhead hatcheries provide salmon and

---

[1]    We note the Department's name at the time these actions were filed was the Department of Fish and Game. The statutes under which the Department operates are codified in what is still called the Fish and Game Code.

4

steelhead to mitigate the loss of wild anadromous fish habitat and upstream spawning areas caused by dam construction, to mitigate fish loss at state-operated pumping facilities in the Sacramento-San Joaquin Delta, and to enhance native anadromous fish populations for recreational and commercial fishing.[2]

The hatchery and stocking enterprise predates CEQA. After CEQA's enactment in 1970, the Secretary of Natural Resources determined the Department's hatchery and stocking enterprise was categorically exempt from complying with CEQA. (CEQA Guidelines, § 15301, subd. (j).)[3] As a result, the Department did not conduct any type of environmental review for the enterprise.

During the past two decades, concerns arose regarding the hatchery and stocking enterprise's impact on native and wild animals and their habitat. Scientific evidence indicated frogs and other amphibians in high mountain lakes were more vulnerable to predation by stocked nonnative trout, contributing to declining amphibian populations. Scientific evidence also indicated planting hatchery salmonids led to genetic hybridization of wild and hatchery anadromous fish, reducing their genetic diversity and strength, and ultimately their populations.

In 2001, the Department began addressing these concerns. To assess the impact stocking high mountain lakes had on amphibians and other wildlife, the Department

---

[2]      Anadromous fish are fish that ascend rivers from the sea for breeding. (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 44, col. 1.)

[3]      The CEQA Guidelines are regulations adopted by the Secretary of the Natural Resources Agency to implement CEQA. (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4.) They are codified at title 14, chapter 3, of the California Code of Regulations (14 Cal. Code Regs. § 15000 et seq.). "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous. [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5.)

began surveying the lakes to determine the presence of several native amphibian and reptile species, fish species, and their habitat, and to assess watershed characteristics (the high mountain lakes project). These mountain lakes and streams were originally without fish, but they were extensively stocked with nonnative trout over the past century, to the extent that most of the lakes now have extant trout populations. The Department ceased stocking most high mountain lakes in the state until the surveys were conducted. As of January 2010, the Department had completed more than 16,000 surveys at approximately 11,000 sites.

The Department has used, and continues to use, the survey data to develop what it calls aquatic biodiversity management plans to govern stocking in mountain waters. Aquatic biodiversity management plans provide for maintaining recreational fisheries while recovering native animals, especially amphibians. They require future mountain lake stocking decisions to be based on the twin objectives of managing the lakes to maintain or restore native biodiversity and habitat quality, and providing for recreational opportunities considering historical and future use patterns. Under the aquatic biodiversity management plans, lakes with existing populations of endangered or threatened amphibian species and other species the Department believes may be vulnerable to harm from stocking, referred to as "decision species," generally will no longer be stocked with fish. If decision species exist within two kilometers of a lake, the Department will assess fishing use and the feasibility of removing the trout from the lake to determine if the lake could be converted to a fishless condition in order to benefit the decision species. Others lakes will be managed for recreational angling. As of January 2010, there were aquatic biodiversity management plans completed or in draft for 27 watershed areas, or "management units."[4]

---

**4**     The Department asks us to take judicial notice of a final aquatic biodiversity management plan, this one for the Desolation Wilderness Management Unit. It was not

6

To address the impacts hatchery salmon and steelhead have on wild populations of native anadromous fish, the Department began preparing what are called hatchery genetic management plans, creatures of federal regulation under the federal Endangered Species Act. (50 C.F.R. § 223.203(b)(5); 16 U.S.C. § 1531 et seq.) Hatchery genetic management plans require the Department to change the ways in which it collects fish for spawning and releases hatchery fish in order to maintain genetic integrity and reduce interactions between wild and hatchery fish. Hatchery genetic management plans must be approved by the National Marine Fisheries Service (NMFS), and as of January 2010, none prepared for California waters had been approved. In the interim, hatcheries that have draft hatchery genetic management plans are following them, and the Department and the NMFS continue to develop guidance and protocols for hatchery operations.

In 2005, the Legislature created a specific fund in the state treasury to finance the Department's hatchery and stocking enterprise. (Stats. 2005, ch. 689, § 1 [AB 7], pp. 5439-5441 [enacting Fish & G. Code, § 13007].) The Legislature directed that fund proceeds be used by the Department in part to attain specific hatchery production goals. It initially required the Department to attain a goal of stocking 2.25 pounds of trout for each sport fishing license sold the previous year. (*Ibid*.) By July 2009, the statute required the Department to attain a goal of stocking 2.75 pounds of trout for each sport fishing license sold. (Stats. 2008, ch. 350, § 1, p. 2735.) In 2007, more than two million fish licenses were sold, translating into a goal of stocking more than five million pounds of trout. By comparison, in 2008, the Department actually stocked 4.3 million pounds of trout.

In 2006, plaintiff Center for Biological Diversity (the Center) sued the Department, claiming the hatchery and stocking enterprise did not qualify for a

---

presented to the trial court as it was finalized on December 19, 2012, after judgment was executed. Because it was not before the trial court, we deny the request.

7

categorical exemption from CEQA, and seeking a writ of mandate compelling the Department to review its hatchery and stocking enterprise in an EIR. That same year, the Department announced it would prepare an "environmental document describing impacts" of its hatchery and stocking enterprise and the protocols it used to determine where fish would be stocked, but it still contended the enterprise was exempt from CEQA.

In 2007, the trial court granted the Center's petition for writ of mandate. It concluded the hatchery and stocking enterprise was not categorically exempt from CEQA because it likely caused significant environmental impacts. It ordered the Department to comply with CEQA and prepare an EIR on its enterprise. However, the court refused to enjoin the Department from operating the enterprise pending completion of the EIR. The Department did not appeal this judgment.

In 2008, the Department moved to modify the judgment to receive additional time to prepare the EIR. The Department had expanded the EIR's scope beyond its hatchery and stocking enterprise to include other Department hatchery programs in part supported by federal funds that involved hatchery fish in other locations and from other vendors. That expansion required the EIR to be a combined EIR/environmental impact statement (EIS) under federal environmental law, and the Department did not have sufficient funds at the time to pay the estimated $1.8 million needed to complete the review. (For ease of reference, we will refer to the EIR/EIS as an EIR.)

The trial court granted the Department's motion and extended the time to complete the EIR. However, it also ordered the Department to suspend stocking nonnative fish in fresh water bodies where surveys showed the presence of sensitive native aquatic or amphibian species, or where such surveys had not been completed.

The Department certified the final EIR in January 2010. It is a significant effort. It includes approximately 650 pages of discussion and an additional 1,800 pages of appendices, of which more than 1,250 pages are responses to public comments. The

8

record also includes the reference material the Department relied upon to prepare the EIR, which totals some 43,700 pages.

The EIR has a broad scope. It is meant to cover the Department's entire fish hatchery and stocking enterprise statewide. It also analyzes three other programs the Department administers: the Fishing in the City program (which provides fishing opportunities in urban areas), the Classroom Aquarium Education Project (which provides school children with opportunities to see fish hatch and grow), and the Private Stocking Permit Program (by which the Department authorizes fish stocking by private aquaculture facilities in private and public lakes and ponds).

Of significance here, the Department selected its current hatchery and stocking operations from 2004 through 2008 as an environmental baseline for its analysis in the EIR. Against this baseline, the EIR analyzed the enterprise's impacts on hydrology, water supply, and water quality; biological resources; recreation and economics; and cultural resources. The EIR identified more than 200 impacts on biological resources, many of which were significant.

The EIR found trout stocking adversely impacted a number of frog species. Stocked fish may directly prey upon some native amphibians and reptiles, and may cause ecological changes that affect the competition for resources between fish and amphibians. To mitigate these impacts to less than significant, the EIR recommended the Department utilize a new protocol to determine whether to stock an inland water body with trout. Under the protocol, referred to as a pre-stocking evaluation protocol (the evaluation protocol), Department biologists would evaluate each stocking location within the range of a decision species in a stepwise fashion to determine whether interactions between stocked trout and decision species may occur, and to evaluate whether stocking may significantly impact the species. If the biologist determines a significant impact is likely, the Department will cease stocking at that location unless and until it develops and implements an aquatic biodiversity management plan for that location. If decision

9

species are not present, stocking may proceed.  A positive stocking determination is valid for five years unless new information necessitates a new evaluation protocol be performed.

The EIR also found that stocking hatchery salmon and steelhead in waters with wild salmon and steelhead significantly and, in some cases, unavoidably impacted wild populations of native anadromous fish.  Stocked fish may prey on and compete with some wild fish populations.  They may also cause adverse effects on the long-term genetic fitness and diversity of some wild populations.  To mitigate these impacts to the extent possible, the EIR called for the Department to continue to develop an expanded hatchery genetic management plan process to govern operation of the salmon and steelhead hatcheries in order to mitigate impacts on wild populations of native anadromous fish.  The hatchery genetic management plan process would include developing and implementing with the NMFS a comprehensive plan to mitigate the impacts and protect decision species, and establishing an independent review panel for the hatcheries.

The EIR also determined stocking for other Department programs could adversely impact decision species.  Stocking for the Fishing in the City program could cause some significant impacts.  Stocking activities for this program introduce hatchery fish and warm water fish into some water bodies that may contain decision species, resulting in some instances of predation and competition for resources, the introduction of pathogens to native amphibian populations, and the spread of invasive species.  To mitigate these impacts, the EIR proposed Department biologists use a protocol analogous to the evaluation protocol, called the private stocking permit evaluation protocol, prior to stocking any water body for the Fishing in the City program.  If biologists identify any amphibians susceptible to pathogens in the water, they will not stock at that location.  The EIR also proposed requiring private aquaculture facilities who participate in the program to monitor and report for invasive species in their stocks on a quarterly basis.

10

Approval of private stocking permits could also cause similar impacts to decision species. To mitigate these impacts, the EIR proposed that before the Department approves a private stocking permit, a Department biologist visit the water body proposed to be stocked and perform the private stocking permit evaluation protocol to determine if the body hosts any decision species, and, if it does, whether stocking in that body would significantly impact that species. If it would, the Department would not approve the permit application.

The EIR considered three project alternatives: (1) continue the existing hatchery and stocking enterprise without change, which the EIR treated as the no project alternative required by CEQA; (2) continue to operate the enterprise but in compliance with the mitigation measures proposed by the EIR to minimize the enterprise's impacts on the environment, including use of evaluation protocols and aquatic biodiversity management plans for trout stocking and hatchery genetic management plans for salmon and steelhead stocking; and (3) permanently operate the enterprise as limited by the trial court during the EIR process, ceasing all stocking in fresh water lakes where decision species exist. The EIR named the second alternative as the preferred alternative.

The EIR did not consider closing the hatcheries or eliminating trout stocking as alternatives. It did not because ceasing operations did not meet what the Department believed was a statutory mandate under Fish and Game Code section 13007 to operate hatcheries to provide fish to meet recreational demand. Ceasing to stock would also place considerable pressure on native and wild stocks that already exist, and would eliminate a large portion of recreational fishing in the state.

In certifying the EIR, the Department approved the second alternative as the project it would undertake, and it adopted findings, a statement of overriding considerations, and a mitigation monitoring and reporting plan, as required by CEQA. As part of adopting the mitigation plan, the Department approved using the evaluation protocol and aquatic biodiversity management plans to mitigate impacts on native trout,

11

the expanded hatchery genetic management plan process to mitigate impacts on wild salmon and steelhead, and the proposed protocols and monitoring and reporting requirements to mitigate impacts caused by the Fishing in the City program and the Private Stocking Permit Program.

The Center, plaintiffs Californians for Alternatives to Toxics et al. (collectively, the Center), and plaintiff California Association for Recreational Fishing (the Association) each petitioned for a writ of mandate against the Department and its certification of the EIR.  The Center alleged the EIR did not comply with CEQA.  The Association alleged the Department imposed the mitigation measures on the Fishing in the City Program and the Private Stocking Permit Program as underground regulations in violation of the APA.

The trial court denied each of the petitions.  The petitioners appealed, and we consolidated the matters for purposes of decision and argument.

DISCUSSION

I

*Standard of Review*

Our standard of review is as follows:

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.'  (Pub. Resources Code, § 21168.5.)  Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'  ([Pub. Resources Code,] § 21168.5; see *Western States Petroleum Assn. v. Superior Court* [(1995)] 9 Cal.4th [559,] 568; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392-393 (*Laurel Heights I*).)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial

12

court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.  [Citations.]  We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [Department] and whether it contains substantial evidence to support the [Department's] factual determinations."  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at pp. 426-427, fns. omitted.)

II

*Case Nos. C072486 and C073011*

The Center contends the Department did not comply with CEQA when it prepared and certified the EIR because it allegedly and improperly:

1.      Used a program EIR to approve future site-specific stocking decisions without performing site-specific review;

2.      Deferred the formulation of mitigation measures for each future stocking decision to future use of the evaluation protocol, the aquatic biodiversity management plans, and the hatchery genetic management plans;

3.      Relied upon the current hatchery and stocking enterprise as the environmental baseline; and

4.      Omitted sufficient consideration of a reasonable range of project alternatives, including a no project alternative of no stocking, and a sufficient explanation for possible alternatives it chose not to review.

We address, and reject, each of these contentions.

A.      *The EIR's level of analysis*

The Center contends the Department improperly used a program EIR as a project or site-specific EIR.  It argues the EIR's level of review is insufficient to approve future stocking decisions because it does not contain site-specific environmental analysis.  As a

13

result, no further CEQA process is allegedly contemplated before final stocking decisions will be made for particular water bodies.

The Department contends the EIR's level of analysis was appropriate. The level of specificity required in an EIR is determined by the nature of the project and the rule of reason. (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 741-742.) The Department argues the Center's contention would require it to conduct separate environmental review for each stocking decision every year. The Department claims reading CEQA in that fashion would violate the governing rule of reason.

We conclude the EIR contains a sufficient level of analysis for a program EIR. It evaluates the known impacts in a comprehensive fashion, and we read it to provide for further environmental review where warranted.

CEQA allows public agencies to use special types of EIR's to simplify preparation and avoid duplication. (*Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 136 Cal.App.4th 1, 22, fn. 10; see 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2014) § 10.2, p. 10-4 (Kostka).)

One of those EIR's is a program EIR. (CEQA Guidelines, § 15168.) "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related [among other possibilities] [¶] [a]s individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (CEQA Guidelines, § 15168, subd. (a)(4).) The hatchery and stocking enterprise is such a project.

Using a program EIR can provide a public agency many advantages as it proceeds with its program. For one, the agency can avoid preparing multiple EIR's for the program and its activities if the program EIR is comprehensive. "Preparation of a

14

program EIR allows a public agency to characterize the overall program as the project that is proposed for approval.  If a sufficiently comprehensive and specific program EIR is prepared, the agency may dispense with further environmental review of activities within the program that are adequately covered by the program EIR.  ([CEQA Guidelines,] § 15168, subd. (c).)"  (Kostka, *supra*, § 10.14, p. 10-20.)

Program EIR's have other advantages.  They may be used to address impacts and mitigation measures that apply to the program as a whole to simplify later environmental review for program activities.  (CEQA Guidelines, § 15168, subd. (d); Kostka, *supra*, § 10.14, p. 10-20.)  They may also be used to consider broad programmatic issues for related actions at an early planning stage when the agency has greater flexibility to deal with basic problems or cumulative impacts.  (CEQA Guidelines, § 15168, subd. (b); Kostka, *supra*, § 10.14, p. 10-20.)

The CEQA Guidelines do not specify the level of analysis required to be performed in a program EIR.  Indeed, "[n]o ironclad rules can be imposed regarding the level of detail required . . . .  EIR requirements must be 'sufficiently flexible to encompass vastly different projects with varying levels of specificity.'  [Citation.]"  (*Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners, supra,* 18 Cal.App.4th at pp. 745-746.)  "The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described in the EIR."  (CEQA Guidelines, § 15146.)

Accordingly, the CEQA Guidelines require an EIR to provide sufficient information in light of what is reasonably feasible.  "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.  An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . .  The courts have looked not for perfection but for adequacy,

15

completeness, and a good faith effort at full disclosure." (CEQA Guidelines, § 15151.) Certainly, a program EIR will better fulfill its purpose of reducing the need for subsequent environmental review the more comprehensive and specific the analysis it provides. (CEQA Guidelines, § 15168, subd. (c).)

The program EIR here satisfies these standards. It reviews and analyzes the hatchery and stocking enterprise specifically and comprehensively, but within reason. Given the nature and statewide scope of the project and the consistency of its impacts across the state, the analysis is adequate to serve as a program EIR that also operates as a project EIR.

Relying upon thousands of pages of compiled data, databases, reports, interviews, peer-reviewed scientific publications, and computer models, the EIR describes in great detail the impacts hatcheries and stocking have on other wildlife on a statewide basis. It reviews the impacts of hatchery operations and stocking in general and on each of the decision species. In particular, it describes the impacts trout stocking has on the amphibian and reptile decision species historically located at high mountain lakes, and the impacts salmon and steelhead stocking has on wild salmon and steelhead in waters with outlets to the ocean.

The EIR organizes its analysis of both stocking enterprises' impacts on biological resources into six categories: (1) impacts related to predation, competition, and related changes in ecological relationships between stocked and native species; (2) impacts related to the catch of native fish by fishermen drawn to the area because the waters are stocked; (3) impacts related to invasive species and pathogens that are accidentally introduced during stocking operations; (4) impacts from interbreeding of hatchery and wild fish, altering the genetic composition of wild populations; (5) impacts that arise from accidental or otherwise unauthorized releases of hatchery trout; and (6) impacts caused by anglers during their pursuit of stocked trout. Within these categories, the EIR reviews the potential impact on *each* decision species.

16

Examples from the EIR illustrate the detailed analysis the document provides. Regarding the impacts stocking fish in mountain lakes has on decision species, the EIR states stocking mountain lakes is a factor that has led to the decline of native amphibians and reptiles in California. Amphibians and reptiles are substantially and adversely affected due to competition and predation with hatchery fish. Those found in formerly fishless areas lack adaptations for defense against predatory fish. Hatchery fish, besides preying on native amphibians and reptiles, may also cause ecological changes that affect the competition for resources.

The EIR analyzes stocking's effect on each of the decision species. For example, the EIR describes lake stocking's effect on the mountain yellow-legged frog. There are 451 trout stocking locations within this species' range. The species has experienced serious population declines in the last century, and stocking is a primary factor in those declines. Introduced trout prey on the species as well as fragment and isolate their populations, reducing their ability to recolonize. The January 2010 EIR stated that recent assessments indicate only a small percentage of mountain yellow-legged frog sites represent healthy populations, and many may not persist without efforts to protect them.

As a result, the Department in 1999 began restoration efforts by removing introduced trout from select lakes. These efforts have resulted in substantial increases in the affected mountain yellow-legged frog populations. The Department is continuing to remove nonnative trout from other lakes. Field experiments suggest removing nonnative trout results in mountain yellow-legged populations recovering quickly.

The EIR concludes trout stocking's effect on mountain yellow-legged frogs is potentially significant. To mitigate the effect, the EIR directs the Department to utilize the evaluation protocol at *each* location where stocking is planned to occur within the species' range. If the potential for trout and mountain yellow-legged frogs to interact exists, and if that potential could result in a substantial impact on the frog, trout will not

17

be stocked at that location unless and until the Department adopts an aquatic biodiversity management plan for that location to mitigate the impact.

The EIR repeats this type of analysis and evaluation for each decision species. And the analysis applies wherever the species is located.

The EIR also details the effects hatchery salmon and steelhead have on wild populations of native anadromous fish. The EIR states stocking hatchery fish can increase the likelihood of predation and competition with wild fish, depending on a number of factors, including the age, size, feeding habits, and density of the fish. The EIR analyzes whether this impact occurs with any of the decision species, and it concludes the impact is significant and unavoidable in certain strains of salmon and steelhead.

The EIR states all aspects of the hatchery enterprise have the potential to adversely affect the long-term genetic fitness and diversity of wild populations of salmon and steelhead that occupy stocked waters. This occurs from capturing native fish that might otherwise spawn in natural waters, rearing fish in artificial channels and reducing their ability to survive in natural conditions, and interbreeding. These factors may cause loss of genetic diversity within and among populations, and reduced fitness, productivity, and abundance. The EIR analyzes these possible effects on each decision salmon and steelhead population group, and finds many of them to be significant and unavoidable.

For example, the EIR states stocking has had, and will continue to have, a significant effect on the genetic integrity of Chinook salmon populations that run in Central Valley rivers in the fall and late fall. This population is genetically homogenized, and that homogenization has often been attributed to the long history of hatchery stocking and to frequent stock transfers between hatcheries. There is a high incidence of straying by these hatchery fish. Some studies suggest hatchery fall-run Chinook have replaced locally adapted populations, a result of a significant gene flow from hatchery stocking programs to the wild fish and a reduced abundance of productive wild fish. The EIR

18

concludes this population is clearly experiencing a significant impact. "Excessive hatchery adults have been demonstrated or are probable in all areas currently supporting at least some wild production of fall-run or late fall-run Chinook salmon." The hatchery enterprises are causing, and will continue to cause, significant environmental effects on this population.

To mitigate these impacts, the EIR directs the Department to continue working with the NMFS to complete the hatchery genetic management plans. However, even with mitigating the effects by developing and operating under a hatchery genetic management plan, the effects would be unavoidable.

The EIR repeats this type of analysis and evaluation for each decision species of wild salmon and steelhead.

In this manner, the EIR disclosed and evaluated all known impacts from hatchery operations and stocking to each decision species. It did so comprehensively and specifically to each species. It allows the Department to go forward with its enterprise, knowing the likely impacts from any stocking decision it makes should it find a decision species in the water body to be stocked.

The Center contends the EIR is inadequate to serve as a project EIR because it does not contain site-specific analysis for each water body to be stocked, and it improperly defers that analysis until the Department performs the evaluation protocol for each site. It argues our decision in *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511 (*Mammoth Lakes*) compels a site-specific analysis be performed before the Department can implement its enterprise at each water body it stocks. We disagree, because unlike the EIR at issue in *Mammoth Lakes*, this EIR is sufficiently comprehensive, as just described, to enable the Department to go forward with its project in compliance with CEQA.

In *Mammoth Lakes*, we determined a program EIR prepared for a proposed redevelopment plan was inadequate under CEQA. The redevelopment plan contained

19

detailed descriptions of 72 different projects to be developed under the plan, but the EIR did not review the potential impacts from any of those projects. We wrote: "[B]ecause a redevelopment plan EIR [under the CEQA Guidelines that existed then] is not a true first tier EIR, and because the Town's redevelopment plan was as detailed as it was, CEQA required the Town's redevelopment plan EIR to contain more analysis of the 72 proposed projects than it did. The Town's failure to analyze the impacts caused by each proposed project, to the extent information was known or reasonably could have been known about each project, constituted a failure to proceed in the manner required by CEQA." (*Mammoth Lakes, supra*, 82 Cal.App.4th at p. 535.)

Unlike in *Mammoth Lakes*, the program EIR here analyzes every impact that reasonably could occur by stocking fish in any water body in the state based on the information currently known. Due to the nature of the project, the EIR explains what the impacts will likely be to decision species at any site where the Department operates hatcheries and stocks fish. Site-specific analysis will likely not reveal any unanticipated impacts; instead, it will reveal whether the impacts discussed in the EIR are occurring at that site.

The Center complains that if site-specific analysis is not done now, it may never be done, or if done, will not be done in a manner that allows public input. CEQA, however, does not require an additional site-specific environmental review document if the agency determines the site-specific impacts were sufficiently addressed in the program EIR, nor does it require that determination to be made in a public process. Only if the agency discovers new impacts will they be addressed in a public process.

When a program EIR is used to avoid preparing subsequent EIR's, such as here, the public agency must examine site-specific program activities "in the light of the program EIR to determine whether an additional environmental document must be prepared." (CEQA Guidelines, § 15168, subd. (c).) If the site-specific activity will not create effects or require mitigation measures that were not discussed in the program EIR,

20

the public agency is not required to prepare any other site-specific environmental document.  (CEQA Guidelines, § 15168, subd. (c)(2.)

Specifically, the rules governing environmental review of subsequent program activities under a program EIR are as follows:

"(1)  If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration.

"(2) If the agency finds that pursuant to [CEQA Guidelines] Section 15162, no new effects could occur or no new mitigation measures would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and *no new environmental document would be required.*

"(3) An agency shall incorporate feasible mitigation measures and alternatives developed in the program EIR into subsequent actions in the program.

"(4) Where the subsequent activities involve site specific operations, the agency should use a *written checklist or similar device to document the evaluation of the site and the activity to determine whether the environmental effects of the operation were covered in the program EIR.*

"(5) A program EIR will be most helpful in dealing with subsequent activities if it deals with the effects of the program as specifically and comprehensively as possible. With a good and detailed analysis of the program, many subsequent activities could be found to be within the scope of the project described in the program EIR, and no further environmental documents would be required."  (CEQA Guidelines, § 15168, subd. (c), italics added.)

In effect, after a sufficiently comprehensive and specific program EIR has been certified, CEQA allows much of the initial site-specific review to occur outside a formal CEQA process and beyond public view.  CEQA does not require the Department to engage in a public process when it determines whether the impacts from a site-specific

project were addressed and adequately mitigated in the program EIR. And if the Department finds the impacts were addressed, it need not prepare a new environmental document at all.

"To hold that a project-specific EIR must be prepared for all activities proposed after the certification of the program EIR, even where the subsequent activity is 'within the scope of the project described in the program EIR' ([CEQA] Guidelines, § 15168, subd. (c)(5)), would be directly contrary to one of the essential purposes of program EIR's, i.e., to streamline environmental review of projects within the scope of a previously completed program EIR. We conclude that a program EIR may serve as the EIR for a subsequently proposed project to the extent it contemplates and adequately analyzes the potential environmental impacts of the project . . . ." (*Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 615.)

The Center contends the evaluation protocol is an inadequate and untimely method for performing site-specific review. To the contrary, the evaluation protocol is a type of "written checklist or similar device" CEQA allows an agency to use to document site-specific impacts and determine whether those impacts were sufficiently analyzed in the program EIR. (CEQA Guidelines, § 15168, subd. (c)(2), (4).)

Before the Department will stock a high mountain lake, it will utilize the evaluation protocol to determine if any decision species are present in that water body. If a decision species is present, the Department will determine whether stocking will have a substantial environmental affect on the species. This review will by necessity include application of the impacts analysis contained in the EIR, as well as a determination of any other impacts that may not have been addressed in the EIR. This is exactly the type of process CEQA requires an agency to utilize outside of public review when it intends to approve a site-specific project that is part of a program previously reviewed in a program EIR. If the Department upon using the evaluation protocol discovers an impact that was

22

not sufficiently addressed in the EIR, it will then be obligated to begin a CEQA process, but only if the Department intends to approve the activity.

The Department has complied with CEQA in preparing a sufficiently adequate program EIR that reviews in a reasonable manner the impacts the enterprise will have on decision species throughout the state, and that will allow it to proceed with its enterprise, subject to the requirements of CEQA.

B.    *Deferral of formulating mitigation measures*

The Center contends the EIR impermissibly defers the formulation of mitigation measures.  It allegedly does this by proposing the Department rely upon the future development of aquatic biodiversity management plans and hatchery genetic management plans to mitigate impacts as a basis for approving future stocking now.  The Center claims CEQA prohibits agencies from approving EIR's that defer formulation of mitigation measures to the future development of a plan.  The Center acknowledges CEQA allows such deferral if the EIR specifies performance standards that future mitigation must meet, but it contends no such standards guide the development of future aquatic biodiversity management plans and hatchery genetic management plans.

We disagree with the Center.  The EIR does not impermissibly defer formulation of mitigation measures, as it provides sufficient performance standards for future mitigation to meet.  It commits the Department to render impacts on inland decision species insignificant before it plants any fish in the high mountain lakes, and it commits the Department to mitigate impacts on wild populations of native anadromous fish by bringing salmon and steelhead planting into conformity with governing federal regulations.

CEQA requires an EIR to propose and describe mitigation measures to minimize a project's significant environmental impacts.  (Pub. Resources Code, §§ 21002.1, subd. (a); 21100, subd. (b)(3).)  Any action, whether it be part of the project or imposed as a condition of approval, that is designed to avoid, minimize, rectify, or reduce or eliminate

23

a significant environmental impact or to compensate for the impact qualifies as a mitigation measure. (CEQA Guidelines, §§ 15126.4, subd. (a)(1); 15370.)

Generally, CEQA requires mitigation measures to be formulated in an EIR and not deferred to the development of future plans or measures, but there is an exception to that rule. "Formulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." (CEQA Guidelines, § 15126.4, subd. (a)(1)(B).)

" 'Impermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR.' [Citation.]" (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 236.)

"[W]hen, for practical reasons, mitigation measures cannot be fully formulated at the time of project approval, the lead agency may commit itself to devising them at a later time, provided the measures are required to '*satisfy specific performance criteria articulated at the time of project approval.*' (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028–1029, [original italics].) In other words, '[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.] On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be made in the report. [Citation.]' (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275.)

"In sum, 'it is sufficient to articulate specific performance criteria and make further [project] approvals contingent on finding a way to meet them.' (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793.) Essentially, the rule prohibiting deferred mitigation prohibits loose or open-ended

performance criteria. Deferred mitigation measures must ensure that the applicant will be required to find some way to reduce impacts to less than significant levels. If the measures are loose or open-ended, such that they afford the applicant a means of avoiding mitigation during project implementation, it would be unreasonable to conclude that implementing the measures *will* reduce impacts to less than significant levels." (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 944-945 (*Rialto Citizens*), original italics.)

However, "when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. Moreover, . . . the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 621.)

The Center contends the Department could have formulated site-specific mitigation measures in the program EIR had it performed site-specific reviews, and there was no justification for its decision not to do either. Even if the Department could defer forming site-specific mitigation measures, the Center claims the EIR still fails because it does not contain specific performance standards or a commitment to mitigate the impacts.

We have already concluded the EIR, as a program EIR, was not required to perform site-specific review. We are left with the Center's assertion that the EIR does not contain specific performance standards for the ultimate mitigation measures to meet or a commitment to mitigate. We disagree with the Center's claim.

CEQA does not define how specific the performance standards set forth in an EIR must be in order to defer formulating mitigation measures. However, *Rialto Citizens, supra,* 208 Cal.App.4th 899, a decision of Division Two of the Fourth Appellate District Court of Appeal, provides persuasive reasoning that supports our conclusion the EIR did

25

not improperly defer formulating mitigation measures. *Rialto Citizens* concerned the adequacy of mitigation measures proposed by an EIR for a large retail development project. Five special status plant species and three special status wildlife species had the potential to occur on the project site. (*Id*. at p. 942.) To mitigate the project's impacts to those species, the EIR proposed the following mitigation measures: for the five plant species, the EIR required a botanist to survey each site. If less than 20 individuals of any of the species were found, no further action was required. If 20 or more were found, the EIR required the botanist to prepare a plan providing for the salvage and transportation of the plants to another location on the project site in permanent open space. The new location had to be maintained and protected for a period of three years. The plan had to include performance criteria, but at a minimum there had to be no less than 80 percent establishment of the individual plants at the end of three years. If those criteria were not met, the monitoring period would be extended another two years. The plan had to be submitted and approved prior to site grading. In addition, if the surveys discovered any state or federal threatened or endangered species, the project would be subject to formal consultation and permitting requirements under state and federal endangered species law. (*Id*. at p. 943.)

For the three wildlife species, the EIR proposed separate sets of mitigation measures; one for two federally endangered kangaroo rat species, and one for the burrowing owl. (*Rialto Citizens, supra,* 208 Cal.App.4th at pp. 943-944.) To mitigate impacts on the two kangaroo rat species, the EIR required a mammalogist to survey the site for habitat prior to the issuance of grading permits and determine whether trapping efforts were necessary. If habitats were found, trapping efforts would proceed following federal protocols. If actual species were found, the project applicant would engage in formal consultation and permitting with the appropriate federal agency as required under federal endangered species law to determine appropriate off-site mitigation. (*Id*. at p. 943.)

To mitigate impacts on the burrowing owl, the EIR required a biologist to survey the site prior to grading to identify burrows and occupied burrows by using a protocol approved by federal and state environmental agencies. After the initial survey, the biologist must conduct four additional surveys focusing on owls during the owl's breeding season. If no owls were located, no further mitigation was required. If owls were observed, the project applicant was required to consult with the city to determine appropriate mitigation, based on conditions at the site. (*Rialto Citizens, supra,* 208 Cal.App.4th at p. 944.)

A citizens group alleged the EIR improperly deferred formulation of mitigation measures, but the Court of Appeal held it did not. It determined these mitigation measures were sufficiently definite to ensure the impacts would be mitigated, and the EIR did not improperly defer formulation of the measures. The requirement to prepare a plant salvage and transportation plan to mitigate for impacts on the plant species was not an improper deferral. The EIR included sufficient performance standards for the salvage plan (maintaining the plant species in an open space area for three to five years if 20 or more individual plants of any species are found prior to grading) to ensure development and operation of the plan will reduce impacts on the plant species to less than significant levels. (*Rialto Citizens, supra*, 208 Cal.App.4th at p. 946.)

The measures protecting the endangered kangaroo rat species and any other endangered or threatened plant species were also adequate, as they required the project applicant to comply with applicable government consulting and permitting regulations. Complying with government regulations as a mitigation measure is not an improper deferral. (*Rialto Citizens, supra*, 208 Cal.App.4th at pp. 945-946.)

Finally, and most significantly here, the Court of Appeal held the EIR's proposed mitigation measures for impacts on the burrowing owl were not improper deferrals. Even though the EIR did not specify exactly what would be done if any burrowing owls were found, by requiring the applicant to conduct five surveys and consult with the city to

27

determine proper mitigation if any owls were found, the EIR committed the applicant and the City to find a way to render any impact insignificant before the City issued a grading permit. (*Rialto Citizens, supra*, 208 Cal.App.4th at pp. 946-947.)

The mitigation measures at issue here pass muster in the same fashion the measures at issue in *Rialto Citizens* survived. The mitigation measures for trout stocking in mountain lakes commit the Department to mitigating impacts to insignificance before the Department recommences stocking. The mitigation measures for the salmon and steelhead stocking commit the Department to mitigate impacts in compliance with federal regulation and to the extent possible for impacts which are unavoidable and cannot feasibly be mitigated fully.

Requiring the Department to survey each mountain lake using the evaluation protocol and to develop an aquatic biodiversity management plan before it stocks any mountain lake where impacts may occur did not impermissibly defer formulating mitigation measures. Rather, it committed the Department to mitigate potential impacts before they occurred. Impacts on mountain lake fish were completely but temporarily mitigated when the trial court and the EIR prohibited the Department from conducting any stocking in the lakes. Stocking will not resume unless and until the Department surveys each lake, and, if any decision species existing in the lake could be adversely affected by stocking, adopts an aquatic biodiversity management plan to govern stocking in that lake. The Department's inability to stock until each lake has been surveyed and an aquatic biodiversity management plan is adopted for any lake where significant impacts may occur commits the Department to mitigating the impacts should it decide to stock in any lake. The Department has no discretion to go forward without first mitigating the impacts.

Also, the EIR provides sufficient performance standards to ensure the aquatic biodiversity management plans will mitigate impacts in mountain lakes to insignificance. The EIR directs the plans to end stocking in most mountain lakes that contain decision

28

species or their habitat. The plans are to be designed to recover native wildlife, especially amphibians, as well as maintain some recreational fisheries.

The EIR directs aquatic biodiversity management plans to satisfy three objectives. First, they are to "[m]anage high elevation aquatic resources in a manner that maintains or restores native biodiversity and habitat quality, supports viable populations of native species, and provides for recreational opportunities considering historical and future use patterns. In some areas, most or all of the waters may be managed as natural resources with little or no angling available. Likewise, in areas of high recreational demand, most or all of the waters may be managed for recreational angling."

Second, all stocking allotments and changes must be based on site-specific data preferably collected within the previous five years.

Third, for each mountain lake, stocking is to be guided by the following relevant principles: (1) Lakes with extant or existing populations of decision species should generally not be stocked with fish. Moreover, if decision species populations exist within two kilometers of the lake, the Department must assess the feasibility of removing all trout from that lake to convert it to a fishless condition in order to benefit the decision species.

(2) *After* achieving these native biodiversity objectives, mountain lakes are to be managed to optimize angling quality and opportunity within a given basin.

These mitigation measures inform the Department how it is to mitigate any impacts on decision species. In most circumstances, it is not to stock lakes where decision species exist, and, additionally, it is to remove all trout from such lakes where it is feasible. These standards are sufficient to inform the Department what it is to do and what it must accomplish, and they commit the Department to mitigating impacts before proceeding with the enterprise.

Requiring the Department to implement hatchery genetic management plans also did not impermissibly defer formulating mitigation measures for impacts on anadromous

fish. Indeed, the EIR determined many of the impacts on anadromous fish were unavoidable and could not feasibly be mitigated to less than significant. In compliance with CEQA, the Department adopted findings of fact stating the impacts could not be feasibly mitigated or that mitigation was the ultimate responsibility of another federal agency. The Department also adopted a statement of overriding considerations by which it expressly declared it was approving the project, despite its environmental harm, because of the project's overriding benefits and the Department's statutory mandate. At that point, there was no additional mitigation to be done. The Center does not challenge these findings.

The Department agreed to lessen impacts to the extent reasonably feasible by developing hatchery genetic management plans for approval by the NMFS. By doing so, the Department relied upon federal regulations requiring a state to develop hatchery genetic management plans in order to continue hatchery and stocking operations as exempt from take prohibitions imposed by the federal Endangered Species Act in waters populated by endangered anadromous species. (50 C.F.R. § 223.203(b)(5).) The plan must effectively protect and achieve "a level of salmonid productivity commensurate with the conservation of the listed salmonids." (50 C.F.R. § 223.203(b)(5)(vi).) It must ensure broodstock collection programs meet a listed species' conservation needs before they can be used to sustain recreational and commercial fisheries. (50 C.F.R. § 223.203(b)(5)(i)(C).)

The hatchery genetic management plan must also minimize the impacts hatchery fish have on wild fish. (50 C.F.R. § 223.203(b)(5)(i)(E).) It must ensure hatchery programs and harvest management are designed to provide as few biological risks as possible on listed species. (50 C.F.R. § 223.203(b)(5)(i)(F).) It must require adequate hatchery facilities to exist to maintain population diversity and avoid hatchery-influenced selection or domestication. (50 C.F.R. § 223.203(b)(5)(i)(G).) And the plan must be approved by the NMFS. (50 C.F.R. § 223.203(b)(5)(K)(v).)

30

These regulations provide sufficient performance standards to satisfy CEQA. "[A] condition requiring compliance with regulations is a common and reasonable mitigation measure and may be proper where it is reasonable to expect compliance. [Citations.]" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906.) Here, it is reasonable to expect compliance, as the Department previously initiated developing hatchery genetic management plans, and it continues to work with the NMFS to obtain its approval. Otherwise, it may run afoul of federal law. There is no doubt the Department is committed to mitigating its impacts on anadromous fish to the extent it feasibly can by adopting and implementing hatchery genetic management plans. Thus, requiring the Department to adopt the plans as a mitigation measure was not an improper deferral of formulating mitigation.

Asserting the EIR improperly defers formulating mitigation measures, the Center claims the issue is governed by *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260 (*Preserve Wild Santee*), in which Division One of the Fourth District Court of Appeal invalidated an EIR for improperly deferring formulation of mitigation measures. We find the case distinguishable. The relevant issue in *Preserve Wild Santee* concerned a proposed residential development's impacts on an endangered butterfly species. The EIR required the developer to create a habitat preserve by means of a conservation easement that would be managed long term under a habitat management plan. The EIR established broad and general goals for the management plan to achieve. It required the plan to accomplish " 'the goal of maintaining appropriate, high-value native plant communities,' " " 'address management and monitoring of vegetation communities through specific minimum survey and management requirements,' " and describe how impacts to vegetation communities will be avoided. (*Id.* at p. 272.) It also required the plan to include a specific section providing for the active management of the endangered butterfly within the preserve. (*Ibid.*)

31

The city circulated a draft version of a habitat management plan. The draft plan concluded the biological resources within the preserve would be managed by allowing ecological processes to occur naturally while managing the effects of human recreational uses of the land by such activities as maintaining trails and fences and removing nonnative vegetation. (*Preserve Wild Santee, supra,* 210 Cal.App.4th at pp. 272-273.)

Regarding the endangered butterfly, the draft plan stated the key consideration was proper vegetation management. Without specifying any particular actions, the plan called for promoting butterfly habitat where host and nectar plants were present, creating other habitat sites, and keeping habitat open by means of periodic fire or other vegetation management, such as grazing. However, the plan indicated the timing and other specifics for undertaking these management activities would be subject to the preserve manager's discretion. It also did not discuss the fact its call for prescribed burns or grazing conflicted with the city's prior decision not to permit prescribed burns or grazing in the project's open space area. (*Preserve Wild Santee, supra,* 210 Cal.App.4th at p. 273.)

The Court of Appeal held the EIR improperly deferred formulating mitigation measures. Although the EIR contained measures to mitigate the loss of the butterfly's habitat, it did not describe any actions for actively managing the butterfly within the preserve, nor did it specify any performance standards or other guidelines for the active management requirement. As a result, the EIR left the success or failure of mitigating the project's impacts on the butterfly to an unformulated plan's eventual directives for actively managing the butterfly within the preserve, and to the preserve manager's discretion to implement the plan. " 'An EIR is inadequate if "[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR." ' [Citations.]" (*Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 281.)

Unlike in *Preserve Wild Santee*, the EIR here did not leave the success of its mitigation measures only to an unformulated plan and executive discretion to implement

32

the plan.  Instead, the EIR, the Department, and the court directed all stocking in high mountain lakes be ceased unless and until an aquatic biodiversity management plan was adopted with its objectives of ending stocking in mountain lakes where decision species would be substantially affected, of removing trout from those lakes where feasible, and then managing lakes for recreation purposes.  The Department has no discretion to continue stocking until mitigation measures are in place.

Similarly, the Department relied upon federal regulations to develop mitigation measures for impacts on anadromous fish.  The Department's commitment to comply with federal regulations to develop hatchery genetic management plans ensures impacts on wild salmon and steelhead will be reduced to the extent reasonably feasible.  *Preserve Wild Santee* does not apply here.

The Center also contends relying on the aquatic biodiversity management plans is inadequate because the plans could allow recreational angling to continue in some lakes.  This argument ignores the EIR and the enterprise's scope and the other objectives of aquatic biodiversity management plans.  The EIR's scope is statewide, as the enterprise is statewide.  Given that size and scope, the Department reasonably determined to mitigate impacts on a statewide and watershed-wide basis by means of the plans, and to mitigate on a site-specific basis by means of the evaluation protocol.  To the extent fishing and stocking continue to create impacts, those impacts are addressed in the statement of overriding considerations.  In addition, the aquatic biodiversity management plans' objectives call for restoring species and habitat and removing trout where feasible first before addressing recreational needs.  As a result, mitigating the impacts takes priority over providing recreational opportunities.

We conclude the EIR did not improperly defer formulation of mitigation measures.

C.	*Using the existing enterprise as the environmental baseline*

The EIR used the Department's hatchery and stocking enterprise from 2004 through 2008 as the environmental baseline against which all impacts from continuing the project would be compared. The EIR states that because the proposed project being evaluated is the continuation of the existing stocking enterprise, "the environmental baseline necessarily includes the implementation of the Program in substantially its present form."

The Center contends the baseline was invalid under CEQA, as it equated the proposed project -- continuing the hatchery and stocking enterprise -- with the current environmental condition. The Center asserts the EIR must use the existing environmental conditions -- absent the project -- as the baseline.

We disagree. CEQA and case authority hold the baseline for a continuing project is the current environmental condition including the project, even if the project has not undergone prior environmental review.

CEQA requires an EIR to "focus on impacts to the existing environment, not hypothetical situations." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955.) "[T]he impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis . . . ." (*Communities for a Better Environment v. South Coast Air Quality Management Dist., supra,* 48 Cal.4th at p. 321 (*Communities*).)

To accomplish this, CEQA directs an EIR to include what is called an environmental baseline, a description of the project site's physical and environmental conditions at the time the EIR is prepared. "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published . . . from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by

34

which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd. (a).)

The "normal" rule is that the baseline must reflect the "physical conditions existing at the time [the] environmental analysis" begins. (*Communities, supra,* 48 Cal.4th at pp. 320, 323.) This is so even if the current condition includes unauthorized and even environmentally harmful conditions that never received, and, as a result of being incorporated into the baseline, may never receive environmental review. (*Citizens for East Shore Parks v. California State Lands Com.* (2011) 202 Cal.App.4th 549, 561 (*East Shore Parks*).)

The facts in *East Shore Parks*, a decision of the First Appellate District's Division One, are similar to those we face, and the case's holding and analysis apply here. The case concerned the renewal of a lease to operate a marine terminal built on state land near an oil refinery. The terminal had been in use since 1902, and the State Lands Commission had granted its operator a 50-year ground lease in 1947. Thus, no CEQA study had examined the terminal's construction or operation, or any improvements the operator had made to the terminal during the lease term. (*East Shore Parks, supra,* 202 Cal.App.4th at pp. 553-554.) Before approving a lease renewal in 1997 to allow the operator to continue operating the terminal, the Commission determined the renewal required CEQA review in an EIR. During the course of preparing the EIR, the Commission decided the appropriate environmental baseline was the existing, actual use and operation of the terminal. Using this baseline, the EIR concluded the renewal could result in significant environmental impacts due to potential oil spills. The Commission certified the EIR and approved the renewal in 2009. (*Id.* at pp. 554-555 & fn. 2.)

Opponents to the lease sued, claiming the EIR violated CEQA by incorporating the ongoing use of the terminal into the environmental baseline. (*East Shore Parks, supra,* 202 Cal.App.4th at pp. 556, 557-558.) The Court of Appeal disagreed. It

35

concluded the Commission complied with CEQA when it used a baseline that included the terminal's use and operation.  (*Id*. at p. 558.)

The court relied on a long line of appellate cases that hold the EIR uses the actual environmental conditions existing at the time of CEQA analysis as a baseline, even when the actual conditions are in violation of current regulatory provisions or were not subject to previous CEQA review.  "For example, in *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428 (*Riverwatch*), [Division One of the Fourth Appellate District] approved the county's chosen baseline, which included illegal development that had occurred at a mining operation seeking a use permit.  The respondents could not, said the court, essentially turn back the clock and insist upon a baseline that excluded existing conditions.  (*Id.* at pp. 1452-1453.)  How present conditions come to exist may interest enforcement agencies, but that is irrelevant to CEQA baseline determinations -- even if it means preexisting development will escape environmental review under CEQA.  (*Riverwatch,* at pp. 1452-1453.)  In *Fat* [*v. County of Sacramento* (2002)] 97 Cal.App.4th 1270 [(*Fat*)], the [Third Appellate District] upheld the county's choice of a baseline reflecting present-day conditions to evaluate the impact of a proposed airport expansion.  Even though 'the Airport developed over a period of nearly 30 years without County authorization, there was evidence of environmental damage during that period, and the Airport had been the subject of at least two zoning enforcement actions . . . ,' the county acted within its discretion using current airport operations as the baseline for CEQA review.  (*Fat,* at pp. 1280-1281.)  Similarly, in *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357 [(Eureka)], [Division Five of the First Appellate District] upheld a project description for CEQA purposes that took into account an existing playground built contrary to code.  'While any alleged code violations in the construction of the playground may have been relevant to the City's consideration of the variance requested, it was not a CEQA consideration.'  (*Eureka,* at p. 371, italics omitted; see also *Fairview Neighbors v. County of Ventura* (1999) 70

Cal.App.4th 238, 242-243 [EIR prepared in conjunction for application to expand mining operation 'properly discussed the existing physical condition of the affected area as including the long-operating mine']; *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1312-1316 & fn. 3 [' "existing facility" ' for categorical exemption purposes means a facility 'as it exists at the time of the agency's determination, rather than . . . at the time CEQA was enacted'; this is consistent 'with cases that have required potential impacts to be examined in light of the environment as it exists when a project is approved'].)" (*East Shore Parks, supra,* 202 Cal.App.4th at pp. 559-560; cf. *Communities, supra*, 48 Cal.4th at p. 322 [EIR set improper baseline by relying on what uses could occur under current permit as opposed to the uses that were actually occurring].)

Based on these holdings, the *East Shore Parks* court concluded the baseline used by the Commission was correct. It reflected " 'what was actually happening' at the site of the proposed project (*Communities, supra*, 48 Cal.4th at p. 322) -- that is, an operating marine terminal. [Citations.] Indeed, we note that in *Riverwatch* and *Fat*, the appellate courts held even unlawful prior development and activity was properly included within the CEQA baselines for evaluation of proposed projects. Here, in contrast, the ' " 'real . . . on the ground' " ' terminal operations (*Communities, supra*, 48 Cal.4th at p. 321) included in the baseline were entirely lawful." (*East Shore Parks, supra,* 202 Cal.App.4th at p. 560.)

Plaintiffs in *East Shore Parks* argued the baseline should exclude use of the marine terminal and the physical structure itself. Otherwise the terminal would never undergo environmental review. They also claimed the line of appellate cases the court relied on did not apply because those cases involved expansions to existing projects. The Center makes the same arguments here. The *East Shore Parks* court rejected these arguments, and we do, too, for the same reasons: "[P]laintiffs claim the baseline here should reflect conditions that have not existed at the locale for more than a century. This is so, say plaintiffs, because if the baseline does not exclude current conditions, there will

never be full environmental review of the marine terminal, since it predates CEQA. [¶] However, neither the statute, nor any CEQA case, supports plaintiffs' revisionist approach to the baseline. To the contrary, the CEQA Guidelines require a 'description of the physical conditions in the vicinity of the project, *as they exist at the time the notice of preparation* [*of an EIR*] *is published*' and specify '[t]his environmental setting will normally constitute the baseline. . . .'" (CEQA Guidelines, § 15125, subd. (a), italics added.) The cases further make clear the baseline must include existing conditions, even when those conditions have never been reviewed and are unlawful. (See *Fat, supra,* 97 Cal.App.4th at pp. 1280-1281; *Riverwatch, supra,* 76 Cal.App.4th at pp. 1452-1453; see also *Communities, supra,* 48 Cal.4th at p. 321 & fn. 7.) That *Fat* and *Riverwatch* involved applications to expand and not merely renew operations, is immaterial. In both, baselines reflecting current conditions, including unauthorized and even environmentally harmful conditions, meant those conditions would never receive environmental review." (*East Shore Parks, supra,* 202 Cal.App.4th at pp. 560-561, fn. omitted.) These arguments apply equally here.

The Center claims the holding of these cases runs afoul of CEQA because the Supreme Court in *Communities, supra*, 48 Cal.4th 310, stated the EIR must describe the baseline "absent the project" under review. (*Id*. at p. 315.) The high court, however, clarified that the project under review there, the addition of a new refining process to an oil refinery, could not be characterized as the refinery's continued operation. It required installing new equipment, and modifying and increasing operation of other equipment in order to add the new process. It was, in short, a new project. (*Id*. at p. 326.) The *Communities* court did not face the issue here -- review of a continuing project that was not planned to undergo expansion or modification.

The Center claims the stocking enterprise is distinguishable from the cases cited above because the Department decides each year whether and where to stock -- in other words, the hatchery and stocking enterprise is not a continuing program. The facts

disprove this assertion, as the enterprise has been running for more than 100 years. Adjustments are made, but a program EIR allows for adjustments to be made without having to prepare a new environmental document with every change. Indeed here, the Department proposes to make no changes to its enterprise except as feasible to mitigate the enterprise's environmental impacts.

The Center's concern that the enterprise's environmental impacts will never be reviewed if the current project is used as the baseline is also disproved by the facts. The EIR does what the Center seeks. Despite using the existing enterprise as the baseline, the EIR describes, as much as reasonably possible, the impacts hatcheries and stocking have had statewide on the environment and the decision species from the enterprise's inception more than a century ago up to this time, and it proposes how to mitigate those continuing impacts, even to the extent of removing fish from lakes that have been populated for decades, and, in many cases, not restocking them again. The Department's use of the current project as its baseline did not violate CEQA or prevent the EIR from analyzing the project's environmental impacts.

D.      *Adequacy of range of alternatives and the no project alternative*

The Center contends the EIR violates CEQA by not considering a no project alternative of no stocking anywhere, or a reasonable range of alternative projects. It also asserts the EIR failed to explain why it chose not to review other alternatives suggested by the Center and others. We conclude the EIR meets CEQA's requirements for reviewing alternatives.

CEQA requires an EIR to "describe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives. An EIR need not consider every conceivable alternative to a project. Rather it must consider a reasonable range of potentially feasible alternatives that will foster informed

39

decisionmaking and public participation.  An EIR is not required to consider alternatives which are infeasible.  The lead agency is responsible for selecting a range of project alternatives for examination and must publicly disclose its reasoning for selecting those alternatives.  There is no ironclad rule governing the nature or scope of the alternatives to be discussed other than the rule of reason.  [Citations.]"  (CEQA Guidelines, § 15126.6, subd. (a).)

In addition to analyzing a range of reasonable alternatives, the EIR must also examine a no project alternative.  "The purpose of describing and analyzing a no project alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project. . . ."  (CEQA Guidelines, § 15126.6, subd. (e)(1).)  "The 'no project' analysis shall discuss the existing conditions . . . as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services. . . ."  (CEQA Guidelines, § 15126.6, subd. (e)(2).)

### 1. *The no project alternative*

The EIR reviewed the baseline project, continuing the existing enterprise without making any changes, as the no project alternative.  It stated consideration of this alternative as the no project alternative was consistent with the CEQA Guidelines.  (See CEQA Guidelines, § 15126.6, subd. (e)(3)(A).)  This alternative would include the elimination of federal funding used to operate certain hatcheries.  Loss of the funding would result in a continued but constrained enterprise, with impacts on other Department programs whose funding would be used to support the stocking enterprise.  The EIR did not review a no stocking alternative, although it has already ceased stocking in many lakes by the trial court's order.

The Center faults the EIR for considering the baseline project as the no project alternative.  It claims the EIR was required to consider the elimination of the stocking enterprise as the no project alternative.  We disagree.  Under CEQA, where the EIR is

40

reviewing an existing operation or changes to that operation, the no project alternative is the existing operation.  Moreover, where a statutory mandate leaves a state agency no discretion to cease or discontinue an existing operation, the no project alternative is the statutorily mandated project.

The purpose of a no project alternative "is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project."  (CEQA Guidelines, § 15126.6, subd. (e)(1).)  Discussing a no project alternative in an EIR "provides the decision makers and the public with specific information about the environment if the project is not approved.  It is a factually based forecast of the environmental impacts *of preserving the status quo*.  It thus provides the decision makers with a base line against which they can measure the environmental advantages and disadvantages of the project and alternatives to the project."  (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 917-918, italics added.)

When a project involves a proposed change to an ongoing operation, or even the continuation of an ongoing operation, a decision to reject the project would leave the operation in place.  In such a situation, CEQA defines the no project alternative as a continuation of the existing operation.  (Kostka, *supra*, § 15.20, p. 15-28.)  The CEQA Guidelines state:  "The 'no project' analysis shall discuss the existing conditions at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services."  (CEQA Guidelines, § 15126.6, subd. (e)(2).)

"When the project is the revision of an existing land use or regulatory plan, policy or ongoing operation, the 'no project' alternative will be the continuation of the existing plan, policy or operation into the future.  Typically this is a situation where other projects

41

initiated under the existing plan will continue while the new plan is developed.  Thus, the projected impacts of the proposed plan or alternative plans would be compared to the impacts that would occur under the existing plan."  (CEQA Guidelines, § 15126.6, subd. (e)(3)(A).)

"After defining the no project alternative . . . , the lead agency should proceed to analyze the impacts of the no project alternative by projecting what would reasonably be expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services."  (CEQA Guidelines, § 15126.6, subd. (e)(3)(C).)

Under these rules, an ongoing operation such as the Department's hatchery and stocking enterprise is the no project alternative, as the status quo is the enterprise's continuation without undergoing any changes.  The EIR is not the approval of a new program; it is the review of an ongoing one.

The Center asserts stocking is a new project because the Department must decide every year to approve the enterprise, but this assertion is incorrect.  The Department approved this enterprise decades ago, and what is decided each year is where to stock, not whether to stock at all.

Indeed, a determination to cease all stocking is not a feasible alternative under CEQA, and thus need not be reviewed in detail in the EIR.  As a result, the no project alternative is by definition the continuing stocking enterprise in this instance.  As used in CEQA, " '[f]easible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, *legal*, social, and technological factors."  (CEQA Guidelines, § 15364, italics added.)  "[A]n alternative is not feasible where there is no way to legally implement it."  (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 602, citing *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 714-715.)

The Legislature has mandated the Department to operate hatcheries and stock water bodies, and it gave the Department no authority to cease those activities. Fish and Game Code section 13007 requires the Department to use state revenues to attain hatchery production and stocking goals imposed by the statute of millions of pounds of trout per year. (Fish & G. Code, § 13007, subd. (b).) When the trial court required the Department to prepare the EIR, it acknowledged Fish and Game Code section 13007 directed the Department "to release certain minimum quantities of trout each year." The Department retained discretion only "to determine where it will [stock], and how much trout to plant in any given location."

Fish and Game Code section 1120 also mandates the Department to establish fish hatcheries for stocking the state's waters. The statute reads: The [Fish & Wildlife Commission] shall establish fish hatcheries for stocking the waters of this State with fish. The department shall maintain and operate such hatcheries." (Fish & G. Code, § 1120.)

The Trout and Steelhead Conservation and Management Planning Act of 1979 (Fish & G. Code, § 1725 et seq.) further reflects the statutory mandate to raise and stock fish. The act declares as a matter of state policy that "[h]atchery production and stocking of California's waters started over 140 years ago and is an enduring part of California's history and attempts to steward its natural resources. [¶] . . . Sustainable and adaptive management provides and improves recreational angling opportunities while protecting and maintaining native and wild trout fisheries, other species, and their mutual habitat." (Fish & G. Code, § 1726.1, subds. (a), (b).) The act obligates the Department to prepare a Strategic Plan for Trout Management that, among other things, establishes "ecologically and environmentally sustainable hatchery and stocking practices for native trout." (Fish & G. Code, § 1728, subd. (c)(4).)

Under these statutes, the Department has no legal authority to discontinue its hatchery and production enterprise. Because the Department cannot legally implement a no stocking alternative, it is an infeasible alternative, and the Department was under no

43

obligation to review it in detail in the EIR. Review of the existing enterprise satisfied the requirement to analyze a no project alternative.

    2.    *Range of alternatives*

As its range of alternatives, the EIR reviewed three different versions of continuing the hatchery and stocking enterprise: (1) continuing the existing enterprise without making any changes (the no project alternative); (2) continuing the existing enterprise with the environmental mitigations proposed in the EIR; and (3) continuing the existing enterprise according to the restrictions set by the trial judge's interim order when it granted the Department additional time to prepare the EIR but prohibited stocking fish in fresh water bodies where decision species existed. The Center claims the EIR failed to analyze a reasonable range of feasible alternatives. We disagree.

"[I]f a reasonable basis for the choices the agency makes is found in the EIR or elsewhere in the record, a reviewing court will defer to the agency's selection of alternatives." (Kostka, *supra*, § 15.17, p. 15-24.) "The selection will be upheld, unless the challenger demonstrates 'that the alternatives are manifestly unreasonable and that they do not contribute to a reasonable range of alternatives.' [Citation.]" (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 988.) "CEQA does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies." (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 420.)

To develop a range of alternatives, the Department used the enterprise's objectives of meeting the production goals of Fish and Game Code section 13007, providing for fishing opportunities, mitigating impacts caused by development as well as the enterprise itself, and providing for long-term recovery and survival of native fish. It found most of the alternatives suggested to it in the scoping process did not meet these basic criteria. Where possible, it incorporated some of the suggested elements into the broader alternatives it reviewed in the EIR. As a result, the range of alternatives reviewed in the

44

EIR provided the Department with feasible alternatives to consider that met the project's objectives and mitigated its impacts. The Center has not shown the range of alternatives in this circumstance was unreasonable.

The Center argues the EIR did not consider a reasonable range, as the first alternative was just the continuation of the enterprise, the second alternative allegedly did not provide any environmental advantages, and the third alternative prevents further studies from being performed. But both the second and third alternative did provide environmental advantages over continuing the enterprise unchanged. Contrary to the Center's contention, the second alternative assumes no stocking will occur in lakes populated with decision species unless and until an aquatic biodiversity management plan is approved, and those plans will limit stocking to prevent impacts to any decision species. Many lakes will no longer be stocked. Expansion into other lakes will occur according to the evaluation protocol to prevent impacts on decision species.

Alternative three also provides environmental benefit, as it permanently prevents stocking in all high mountain lakes where decision species are known to exist, or where surveys to determine their existence were not completed. The Center complains this alternative is not reasonable because it is based on a court order, but there can be no denying this alternative prevents the enterprise from detrimentally impacting decision species, as no stocking will occur in those waters.

Under these circumstances, the range was reasonable. It provided the Department with two alternatives, both environmentally superior over the continuing enterprise, by which to mitigate impacts.

3. *Rejection of other alternatives*

The EIR briefly considered but ultimately rejected for detailed analysis four additional alternatives. One was to eliminate all Department-operated hatcheries. The Department eliminated this alternative because it did not meet Fish and Game Code section 13007's requirement to use state revenues to meet fish stocking goals. A second

rejected alternative called for eliminating trout stocking in flowing waters, as the State of Montana has apparently done. The Department eliminated this alternative because fishing demand in California exceeds that in Montana, and eliminating stocking in flowing waters would eliminate a large proportion of recreational fishing opportunities and would put considerable pressure on native and wild stocks.

A third rejected alternative was to establish permanent stocking closures. Although the Department rejected this alternative in full, it incorporated the principal of no longer stocking certain areas in two of the alternatives the EIR considered in detail. A fourth rejected alternative proposed developing and operating conservation and restoration trout hatcheries. The Department noted there were already some hatcheries that provided for conservation and restoration on an as-needed basis; however, other Department policies require the use of other management actions to preserve and restore native trout populations.

The Center faults the EIR for not including these or other suggested alternatives or explaining in more detail why the other alternatives were rejected. However, an EIR need only "indentify any alternatives that were considered by the lead agency but were rejected as infeasible during the scoping process and briefly explain the reasons underlying the lead agency's determination." (CEQA Guidelines, § 15126.6, subd. (c). The EIR complied with this directive. The Department did not abuse its discretion in complying with CEQA's requirements for consideration of alternatives.

In sum, we conclude the Department did not abuse its discretion in preparing and certifying the EIR.

### III

*Case No. C072790*

The Association contends three mitigation measures imposed by the Department on the Fishing in the City Program and private stocking permit applications are actually underground regulations -- regulations adopted without complying with the notice and

46

procedure requirements imposed by the APA.  We conclude the three measures are underground regulations.

A.      *Additional background information*

1.      *Fishing in the City program*

Fishing in the City is a program implemented by the Department to provide angling opportunities in urban areas.  Under the program, the Department stocks fish in urban lakes and ponds.  Department biologists select the water bodies to be stocked, and the Department contracts with vendors to provide and stock the fish.

The Fishing in the City program is not mandated by statute.  However, a statute requires the Department to use all funds allocated for purchasing fish for the program to purchase the fish from private registered aquaculture facilities pursuant to the rules of the Public Contract Code unless the private facilities are unable to provide the fish or their fish are diseased.  (Fish & G. Code, § 1123.5.)

The Department adopted two mitigation measures proposed by the EIR, BIO-226 and BIO-229, to mitigate impacts the Fishing in the City program may have on any decision species.  BIO-226 requires Department biologists to evaluate water bodies proposed for stocking under the Fishing in the City program to determine the presence of any decision species by using a stocking protocol similar to the evaluation protocol called the private stocking permit evaluation protocol.  If decision species may occur, the biologist must consider whether stocking hatchery fish in the water body would adversely affect those species or their habitat.  This review process must be implemented in each region sponsoring Fishing in the City programs.

The other mitigation measure, BIO-229, requires private aquaculture facilities participating in the Fishing in the City program to monitor and report the existence of invasive species at their facilities.  The monitoring shall be done quarterly by a qualified person using Department standards, and reports shall be submitted to the Department.

Presently, the facilities are to monitor for New Zealand mudsnails, quagga mussels, and zebra mussels.

2. *Private stocking permits*

Under state statute, a person may apply to the Department for a permit to stock fish in a stream or lake. (Fish & G. Code, § 6401.) Department regulations prohibit private stocking of fish which are parasitized, diseased, or of an unauthorized species. (Cal. Code Regs., tit. 14, § 238.5, subd. (a).) They also prohibit stocking any species of fish in any water in which such stocking is contrary to the Department's fishery management plans. (Cal. Code Regs., tit. 14, § 238.5, subd. (d)(3).)

The Department adopted mitigation measure BIO-223b to address impacts private stocking may have on decision species. BIO-233b requires a Department biologist, before approving a private stocking permit application, to review the proposed stocking water body for the presence of decision species by using the private stocking permit evaluation protocol. If decision species are found, the biologist must determine whether the proposed stocking would result in a substantial adverse effect on a decision species. If it would, the biologist must deny the permit application.

B. *Analysis*

"Unless it is subject to one of the enumerated exceptions, every regulation must be adopted consistent with the procedural requirements of the APA. (Gov. Code, § 11340 et seq.) This requires, among other things, public notice and an opportunity for public comment before the regulation takes effect. (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333 (*Morning Star*).) A regulation that is adopted inconsistently with the APA is an 'underground regulation' (Cal. Code Regs., tit. 1, § 250) and may be declared invalid by a court (*Morning Star, supra,* at p. 333; Gov. Code, § 11350). Such a declaration is what the [Association] seek[s] in this action.

"The APA defines a 'regulation' as a rule or standard of general application. (Gov. Code, § 11342.600.) The state agency rule or standard is a regulation subject to the

48

APA if (1) it applies generally rather than to a specific case and (2) it implements, interprets, or makes specific the law enforced or administered by the state agency imposing the rule or standard.

"Several exceptions exempt regulations from the requirements of the APA. These exceptions allow the state agency to enforce or impose the rule or standard without promulgating it pursuant to the APA, even though the rule or standard fits the definition of a 'regulation.' " (*Bollay v. California Office of Administrative Law* (2011) 193 Cal.App.4th 103, 106-107 (*Bollay*).)

The Department claims the mitigation measures are exempt from the APA under two exemptions: One exempts from the APA a regulation that "relates only to the internal management of the state agency." (Gov. Code, § 11340.9, subd. (d).) A second exempts a regulation that "embodies the only legally tenable interpretation of a provision of law." (Gov. Code, § 11340.9, subd. (f).) We turn to decide whether the three mitigation measures contested by the Association qualify under either of these exemptions to the APA.

1.    *BIO-226*

The Department claims BIO-226, the measure requiring Department biologists to evaluate whether water bodies should be stocked for the Fishing in the City program, is exempt from the APA as a rule governing the Department's internal management practices. It asserts the measure qualifies for this exemption because the rule applies only to the Department and its biologists in making stocking decisions. Any impact on venders who do not receive contracts to supply fish because a water body is not chosen for the program is incidental.

To support its argument, the Department relies upon a case from this court, *Californians for Pesticide Reform v. California Dept. of Pesticide Regulation* (2010) 184 Cal.App.4th 887 (*Pesticide Reform*), which held the internal management exemption

49

applied where an "agency's rule does not require the individuals or entities affected to do anything they are not already required to do . . . ." (*Id*. at p. 909.)

The Association contends *Pesticide Reform* is an outlier, and urges us to apply a more narrow interpretation of the internal management exemption such as that given in *Grier v. Kizer* (1990) 219 Cal.App.3d 422 (*Grier*) (disapproved on another ground by *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 577 (*Tidewater*)), a case from Division Three of the Second Appellate District that *Pesticide Reform* refused to follow. Relying upon *Armistead v. State Personnel Board* (1978) 22 Cal.3d 198 (*Armistead*), *Grier* held the exemption applied only to purely internal rules which govern an agency's procedure, not to rules that had an external impact. According to *Grier*, whether a rule requires affirmative conduct by an affected party is not dispositive. (*Grier, supra*, 219 Cal.App.3d at p. 437.)

We need not resolve the disagreement between *Pesticide Reform* and *Grier* over whether a rule must require affirmative conduct by an affected party in order to be classified as a regulation subject to the APA. Instead, we further define the test first expressed by *Pesticide Reform*, and conclude BIO-226 goes beyond the Department's internal management. In *Pesticide Reform*, a state statute required the state Department of Pesticide Regulation to assess the risk of harm presented by pesticides used in the state, determine whether they are toxic air contaminants, and adopt measures to control them. The Department established a policy to prioritize pesticides in the order it would review them. (*Pesticide Reform, supra,* 184 Cal.App.4th at pp. 893-894.) We concluded the prioritization policy was exempt from the APA as an internal management policy because it required no affirmative conduct by an affected party. (*Id*. at pp. 907-908.) However, we emphasized that the "Department was authorized to evaluate all pesticides in California, and the director was given the discretion to determine the order in which the pesticides would be evaluated. . . . [T]he prioritization policy will not determine if

50

the pesticides will undergo review, but merely prioritize when the pesticides will undergo review." (*Id.* at p. 909.)

Unlike the policy at issue in *Pesticide Reform*, BIO-226 does not merely grant the Department discretion to allocate or prioritize its own resources before performing a statutory duty. It requires the Department to perform a *new* duty. The mitigation measure is not a determination of when or in what order a water body will be evaluated; it is a directive to evaluate all water bodies the Department proposes to include in the Fishing in the City program, to do so in a particular manner, and to eliminate what could be a significant number of water bodies from the program. BIO-226 does not concern only internal affairs; it substantively affects a public program the Department administers.

The mitigation measure also significantly affects numerous citizens, both those who run established fish stocking businesses and those, especially children, who enjoy participating in the Fishing in the City program. While BIO-226 does not require fish farmers and vendors to engage in any affirmative conduct, it will detrimentally affect them. Implementing BIO-226 will likely eliminate a number of water bodies from the Fishing in the City program to the detriment of the farmers' businesses and the citizens who enjoy participating in the program -- an impact more detrimental than the impact some may have experienced by the prioritization policy at issue in *Pesticide Reform*, or, by analogy, a rule that merely prioritized when the Department would evaluate certain water bodies.

"A major aim of the APA was to provide a procedure whereby people to be affected may be heard on the merits of proposed rules." (*Armistead, supra,* 22 Cal.3d at p. 204.) Where the challenged policy goes beyond merely prioritizing or allocating internal resources and may significantly affect others outside the agency, a fact situation *Pesticide Reform* did not encounter, such a policy goes beyond the agency's internal management and is subject to adoption as a regulation under the APA. The Department

51

should hear from the general public, as well as the citizens who operate fish stocking businesses and those who participate in the Fishing in the City program who will be affected by BIO-226, before it adopts and implements the measure.

2.     *BIO-229*

The Department claims BIO-229, the measure requiring private fish vendors participating in the Fishing in the City program to monitor and report any invasive species, is exempt from the APA as the only legally tenable interpretation of a law. Section 2301 of the Fish and Game Code and other regulations prohibit the possession or transfer of New Zealand mudsnails and dreissenid mussels, a term which includes the species of quagga mussels and zebra mussels.  (Fish & G. Code, § 2301, subd. (a)(1); Cal. Code Regs., tit. 14, § 671, subds. (a), (c)(9)(A), (c)(10).)  Any entity that discovers dreissenid mussels must report the discovery immediately to the Department.  (Fish & G. Code, § 2301, subd. (e).)  The Department argues BIO-229 is exempt from the APA because it merely applies these existing statutes and regulations to a particular situation.

The Department overstates the exception.  Any rule that implements, interprets, or makes specific the law being enforced is a regulation subject to the APA unless the rule is the only legally tenable interpretation of the law.  This exception is narrow.  "[A]n agency interpretation of a statute is not subject to the APA if it is 'the only legally tenable interpretation' of the statute.  (Gov. Code, § 11340.9, subd. (f).)  That phrase has been construed to apply only if the interpretation is 'patently compelled by . . . the statute's plain language.'  (*Morning Star, supra,* at p. 337.)  An interpretation is 'patently compelled' when it ' "can reasonably be read only one way" [citation], such that the agency's actions or decisions, in applying the law are essentially rote, ministerial, or . . . repetitive of . . . the statute's plain language.'  (*Id.* at pp. 336-337.)  By contrast, 'interpretations that arise in the course of case-specific adjudication are not regulations . . . .'  (*Tidewater, supra,* 14 Cal.4th at p. 571.)"  (*California Grocers Assn. v. Department of Alcoholic Beverage Control* (2013) 219 Cal.App.4th 1065, 1074.)

"Under the 'only legally tenable interpretation' exception, the state agency need not promulgate [a regulation] pursuant to the APA if the regulation essentially reiterates the law. If the regulation departs from or embellishes upon the law, the state agency must comply with the APA. [Citation.]" (*Bollay, supra,* 193 Cal.App.4th at p. 107.)

BIO-229 goes beyond simply reiterating the law or applying the law in a rote or ministerial manner. It imposes on a class of persons a new affirmative duty to monitor and report on a quarterly basis the existence of invasive species in their waters if they bid for, and receive, a contract to supply fish for the Fishing in the City program. This new duty is not a new duty patently compelled by Fish and Game Code section 2301. That statute requires entities to report the discovery of invasive species, but it does not require entities to monitor and report on a quarterly basis. In fact, the statute authorizes the Department also to take a number of actions to stop dreissenid mussels from entering state waters, including inspecting any containers or trailers that may carry dreissenid mussels. If the Department can inspect for dreissenid mussels before a container of fish is brought to a participating water site, it is not patently apparent from Fish and Game Code section 2301 that requiring private parties to monitor and report on a regular basis the existence of invasive species in their waters is the only legally tenable interpretation of that statute. If the Department wants to adopt such a rule for its Fishing in the City program, it needs to do so by regulation. (Fish & G. Code,. § 2301, subd. (g).)

3.      *BIO-233b*

The Department argues BIO-233b, the measure effectively prohibiting the issuance of private stocking permits if a Department biologist concludes the proposed stocking would substantially and adversely affect any decision species, is exempt from APA requirements as the only legally tenable interpretation of a provision of law. Specifically, Department regulations prohibit any person from stocking any species of fish in any water where such stocking is contrary to the Department's fisheries management programs. All applicants will be advised upon request of those management

53

programs.  (Cal. Code Regs., tit. 14, § 238.5.)  The Department claims the requirement for Department biologists to use an evaluation protocol before granting a private stocking permit is the only tenable interpretation of its regulation.

We disagree.  The Department's interpretation is not the only interpretation it could apply to the regulation, nor does its interpretation essentially repeat the regulation. The regulation is silent regarding how it should be enforced.  Another possible interpretation the Department could reach would be to require the permit applicant to submit a report from a qualified biologist certifying the nonexistence of any decision species or that stocking would not have a significant adverse effect on decision species. Because the Department's interpretation is not the only reasonably tenable interpretation of California Code of Regulations, title 14, section 238.5, it is a regulation that must be adopted according to the APA's procedures.

## DISPOSITION

The judgments in case Nos. C072486 and C073011, appealed by the Center for Biological Diversity and Californians for Alternatives to Toxics et al., are affirmed.  The Department is awarded its costs on appeal in these cases.  (Cal. Rules of Court, rule 8.278(a).)

The judgment in case No. C072790, appealed by the California Association for Recreational Fishing, is reversed.  The Association is awarded its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

                                                                   NICHOLSON     , Acting P. J.

We concur:


       DUARTE         , J.


       HOCH           , J.