Filed 12/23/22  Save 30th Street Parking v. City of San Diego CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAVE 30TH STREET PARKING,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SAN DIEGO et al.,<br><br>    Defendants and Respondents;<br><br>ORTIZ CORPORATION,<br><br>    Real Party in Interest and Respondent. | D079752<br><br><br><br>(Super. Ct. No. 37-2019-00042552-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Craig A. Sherman, for Plaintiff and Appellant.

Mara W. Elliott, City Attorney, M. Travis Phelps, Assistant City Attorney, and Benjamin P. Syz, Deputy City Attorney, for Defendants and Respondents.

No appearance for Real Party in Interest and Respondent.

This litigation involves a challenge to an approval by the City of San Diego (the City) of a public works project to install protected bicycle lanes on 30th Street as it runs through the North Park neighborhood. Specifically, appellant Save 30th Street Parking (Save 30th Street) appeals from the trial court's denial of its petition for writ of mandate, which alleged that the City did not comply with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) before approving the project and that the project is inconsistent with the City's planning documents in violation of the Planning and Zoning Law (Gov. Code, § 65000 et seq.).

We conclude that the City did not violate CEQA in approving the project, and that the project is consistent with the relevant planning documents. Accordingly, we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Beginning in late 2018, in connection with a public works project to replace a water pipeline, which would involve street resurfacing, the City identified a potential opportunity to implement bicycle lanes along 30th Street in the North Park neighborhood. 30th Street has one lane of traffic in each direction and, at the time, was marked with "sharrows," indicating that motorists must share the road with bicyclists. The City's engineers prepared a study setting forth multiple options for implementing bicycle lanes on 30th Street, each of which would require the loss of at least some of the parking spaces along 30th Street. On May 16, 2019, the City's mayor issued a memorandum which endorsed "Option A" proposed by the City's engineers, involving the installation of a "Class IV" protected bikeway and the loss of

420 parking spaces (the Bikeway Project).[1] The mayor also directed staff to evaluate additional blocks of 30th Street to the north for inclusion in the Bikeway Project.

Save 30th Street filed a petition for writ of mandate on August 13, 2019, against the City and its mayor, in his official capacity.[2] The first cause of action alleged the City had committed itself to the Bikeway Project without first complying with CEQA. The second cause of action alleged the Bikeway Project was inconsistent with the North Park Community Plan, the City's Bicycle Master Plan, and the mobility element of the City's General Plan.

---

[1] Bikeways are classified by the California Department of Transportation based on their characteristics. A Class IV bikeway is dedicated for the exclusive use of bicycles and includes a separation between the bikeway and vehicular traffic. A Class III bikeway uses signage to provide for shared use with motor vehicle traffic within the same travel lane, often referred to as "sharrows." Prior to the implementation of the Bikeway Project, 30th Street through North Park was a Class III bikeway, as it was marked with "sharrows." Class II bikeways are one-way facilities on either side of a roadway designated for exclusive or preferential bicycle travel with striping and signage, but without the separation from vehicular traffic provided by Class IV bikeways. Class I bikeways are off-street paved paths for the exclusive use by bicyclists, pedestrians, and those using non-motorized modes of travel.

[2] At the time the petition was filed, the City's mayor was Kevin Faulconer. During the course of this litigation, Todd Gloria became the City's mayor. The operative version of Save 30th Street's petition states, "Respondent Todd Gloria is the current mayor of the City . . . and is sued herein in his official capacity, as a continuation of the action of previous Mayor Kevin Faulconer . . . ." Save 30th Street does not purport, in its appellate briefing, to be pursuing an appeal regarding its claims against the City's mayor specifically. Further, the respondent's brief in this appeal was filed solely by the City (not separately including its mayor). Therefore, we limit our analysis to whether Save 30th Street's appeal has merit as against the City.

On December 4, 2019, a plan called "Option A+" for the development of a protected bike lane on 30th Street was presented to the City's Mobility Board. The revised plan extended the bicycle lane to the north as suggested by the mayor. According to the City, it also restored some of the parking spaces that "Option A" would have removed.[3]

On January 30, 2020, a memorandum by Program Manager Heidi Vonblum in the City's Planning Department, which was addressed to Program Manager Everett Hauser in the City's Transportation & Storm Water Department, discussed the issue of whether the City was in compliance with CEQA regarding the proposed Bikeway Project (the CEQA memo). The CEQA memo was not a model of thoroughness or clarity with respect to its analysis or conclusions. However, the CEQA memo generally set forth two grounds for concluding that the City was not required to conduct any CEQA analysis for the Bikeway Project. First, the CEQA memo concluded that the Bikeway Project was not subject to CEQA because it was an activity that "will not result in a direct or reasonably foreseeable indirect physical change in the environment." (See CEQA Guidelines, §§ 15060, subd. (c)(2), 15378, subd. (a).)[4] Second, the CEQA memo stated that the Bikeway Project "would also implement the goals and policies of the City's Bicycle Master Plan and North Park Community Plan." More specifically, it

[3]     The parties have not identified any portion of the administrative record that sets forth the exact number of parking spaces that were removed from 30th Street under "Option A+."

[4]     The regulations implementing CEQA are codified at California Code of Regulations, title 14, section 15000 et seq., and are commonly referred to as the "CEQA Guidelines." All further references to the "CEQA Guidelines" are to California Code of Regulations, title 14, section 15000 et seq.

4

observed that those "goals and policies were analyzed in the Final Program Environmental Impact Report . . . for the Bicycle Master Plan . . . and the Final [Program Environmental Impact Report] for the North Park and Golden Hill Community Plan Updates." The CEQA memo concluded that "because the [Bikeway] Project is consistent with these plans, it is also consistent with the abovementioned environmental documents." Although the CEQA memo did not include any specific discussion about the content and coverage of the program environmental impact reports (program EIRs) for the Bicycle Master Plan and the North Park and Golden Hill Community Plan Updates to show that the Bikeway Project was within the scope of those program EIRs, we understand the CEQA memo to have taken the position that no further CEQA analysis was required for the Bikeway Project because it fell within the scope of the CEQA analysis conducted in the two program EIRs.

On May 26, 2020, Save 30th Street filed a motion seeking a preliminary injunction to stop the City from moving forward with the Bikeway Project. The trial court denied the motion for a preliminary injunction on August 10, 2020.

With leave of the trial court, Save 30th Street filed a supplemental petition on August 21, 2020, which included updated factual allegations.

On November 17, 2020, the City Council approved a construction change order to fund the water pipeline replacement project, which included funds for the implementation of the Bikeway Project.

In December 2020, Save 30th Street again sought preliminary injunctive relief to stop the implementation of the Bikeway Project, which the trial court denied.

Save 30th Street filed the operative First Amended Petition for Writ of Mandate on April 26, 2021. The first amended petition updated the factual allegations and added as a real party in interest, Ortiz Corporation, which was the construction company implementing the Bikeway Project.[5]

On August 19, 2021, after considering the parties' briefing and hearing argument, the trial court issued an order determining that Save 30th Street's petition lacked merit. The trial court concluded that the City was not required to perform a CEQA analysis because the Bikeway Project was within the scope of the program EIRs for the City's Bicycle Master Plan and the North Park and Golden Hill Community Plan Updates. It further concluded that the Bikeway Project was consistent with the applicable planning documents.

Save 30th Street appeals from the subsequently entered judgment.[6]

---

[5] Real party in interest Ortiz Corporation has not appeared in this appeal.

[6] As the parties acknowledge, the Bikeway Project was installed during the summer of 2021 and is in active use. Although the City suggested in a single sentence in its August 24, 2022 supplemental letter brief that this appeal may be moot because the Bikeway Project has already been implemented, the City has not moved to dismiss this appeal on the ground of mootness. (Cf. *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1576 [a project's completion "moots an action seeking to require preparation of an [environmental impact report] for a particular project"]; *Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1547, 1548 [noting that "[g]eneral principles for determining whether an appeal is moot have been applied to CEQA cases" but pointing out that "[s]everal courts have considered a CEQA challenge on the merits after determining that effective relief may be granted despite partial or complete construction of the challenged project"].) Because we conclude, in any event, that the appeal lacks merit, and because the City has not asked us to dismiss

II.

DISCUSSION

A.    *Save 30th Street's Contention That the City Failed to Comply With CEQA in Approving the Bikeway Project*

We first address Save 30th Street's contention that the City failed to comply with CEQA in approving the Bikeway Project.

1.    *Applicable Legal Principles*

" 'In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to "[e]nsure that the long-term protection of the environment shall be the guiding criterion in public decisions." ' [Citation.]  At the 'heart of CEQA' (CEQA Guidelines, § 15003, subd. (a)) is the requirement that public agencies prepare an [environmental impact report (EIR)] for any 'project' that 'may have a significant effect on the environment.'  ([Pub. Resources Code,] § 21151, subd. (a); see *id.*, §§ 21080, subd. (a), 21100, subd. (a).)  The purpose of the EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (Pub. Resources Code, § 21061.)  The EIR thus works to 'inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made,' thereby protecting ' "not only the environment but also informed self-government." ' "  (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944-945.)

---

the appeal, we need not, and do not, consider whether implementation of the Bikeway Project has rendered this litigation moot.

7

A public agency's "implementation of CEQA proceeds by way of a multistep decision tree, which has been characterized as having three tiers. [Citation.] First, the agency must determine whether the proposed activity is subject to CEQA at all. Second, assuming CEQA is found to apply, the agency must decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review. Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity, the third tier." (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1185 (*UMMP*).)

With respect to the first tier, "a proposed activity is a CEQA project if, by its general nature, the activity is capable of causing a direct or reasonably foreseeable indirect physical change in the environment. This determination is made without considering whether, under the specific circumstances in which the proposed activity will be carried out, these potential effects will actually occur. Consistent with this standard, a 'reasonably foreseeable' indirect physical change is one that the activity is capable, at least in theory, of causing. [Citation.] Conversely, an indirect effect is not reasonably foreseeable if there is no causal connection between the proposed activity and the suggested environmental change or if the postulated causal mechanism connecting the activity and the effect is so attenuated as to be 'speculative.' " (*UMMP*, *supra*, 7 Cal.5th at p. 1197.)[7]

---

[7]    As we have explained, one of the conclusions reached by the City in the CEQA memo was that the Bikeway Project was not an activity capable of causing a direct or reasonably foreseeable indirect physical change in the environment and thus was not a project subject to CEQA. Although the City advanced that theory in the trial court, in ruling on Save 30th Street's petition, the trial court rejected it. As the trial court explained, the loss of

8

With respect to the second tier, "[i]f the lead agency concludes it is faced with a project, it must then decide 'whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines.' . . . If the lead agency concludes a project is exempt from review, it must issue a notice of exemption citing the evidence on which it relied in reaching that conclusion. . . . The agency may thereafter proceed without further consideration of CEQA." (*UMMP*, *supra*, 7 Cal.5th at p. 1186.)[8]

---

parking on 30th Street due to the Bikeway Project could possibly cause a physical change to the environment by virtue of potential changes in traffic. (See *Taxpayers for Accountable School Bond Spending v. San Diego Unified School Dist.* (2013) 215 Cal.App.4th 1013, 1051 ["as a general rule, we believe CEQA considers a project's impact on parking of vehicles to be a physical impact that could constitute a significant effect on the environment"].) On appeal, the City no longer advances the argument that the Bikeway Project was not a project within the meaning of CEQA. In light of the City's position in this appeal, we proceed with our analysis by assuming, without deciding, that the Bikeway Project is a CEQA project under the first tier of the CEQA inquiry.

[8] The CEQA memo did not identify any statutory or categorical exemptions to CEQA that might apply to the Bikeway Project. However, the administrative record contains a draft document, prepared by City staff, suggesting that the City was at one point considering the applicability of the categorical exemptions for "[t]he creation of bicycle lanes on existing rights-of-way" (CEQA Guidelines, § 15304, subd. (h)) and alterations to existing streets "such as the addition of bicycle facilities, including but not limited to bicycle parking, bicycle-share facilities and bicycle lanes." (*Id.*, § 15301, subd. (c); but see *id.*, § 15300.2 [setting forth exceptions to the categorical exemptions, including that "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances"].) The applicability of those exemptions has not been litigated in this proceeding. We note, however, that in the supplemental briefing we requested regarding the appropriate remedy in the event Save 30th Street prevailed on appeal,

9

On the third tier of the CEQA decision tree, "[e]nvironmental review is required under CEQA only if a public agency concludes that a proposed activity is a project and does not qualify for an exemption. In that case, the agency must first undertake an initial study to determine whether the project 'may have a significant effect on the environment.' [Citations.] If the initial study finds no substantial evidence that the project may have a significant environmental effect, the lead agency must prepare a negative declaration, and environmental review ends. [Citations.] If the initial study identifies potentially significant environmental effects but (1) those effects can be fully mitigated by changes in the project and (2) the project applicant agrees to incorporate those changes, the agency must prepare a *mitigated* negative declaration. This too ends CEQA review. [Citations.] Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact and a mitigated negative declaration is inappropriate, the lead agency must prepare and certify an EIR before approving or proceeding with the project." (*UMMP*, *supra*, 7 Cal.5th at pp. 1186-1187.)

As centrally relevant here, a variation on this decision tree exists when an agency has previously prepared a program EIR and the current project is within the scope of that program EIR. "A program EIR is an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the

the City stated that if it was ordered to perform further CEQA analysis, it could conclude that those categorical exemptions apply to the Bikeway Project. We express no view on the issue.

10

same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (CEQA Guidelines, § 15168, subd. (a).) " '[A] program EIR may serve as the EIR for a subsequently proposed project to the extent it contemplates and adequately analyzes the potential environmental impacts of the project . . . .' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 239 (*Center for Biological Diversity*).)

" ' "If a program EIR is sufficiently comprehensive, the lead agency may dispense with further environmental review for later activities within the program that are adequately covered in the program EIR." ' " (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1051.) "If the site-specific activity will not create effects or require mitigation measures that were not discussed in the program EIR, the public agency is not required to prepare any other site-specific environmental document." (*Center for Biological Diversity*, *supra*, 234 Cal.App.4th at p. 238.) In such a case, the question is whether the evidence supports a determination that the project "was either the same as or within the scope of the project, program, or plan described in the program EIR." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1320-1321.)

The rules applicable to whether additional environmental review is required in the context of a program EIR are set forth in section 15168, subdivision (c) of the CEQA Guidelines.

> "(1) If a later activity would have effects that were not examined in the program EIR, a new initial study would need to be prepared leading to either an EIR or a negative declaration. . . .
>
> "(2) If the agency finds that . . . no subsequent EIR would be required, the agency can approve the activity as being within the

11

scope of the project covered by the program EIR, and no new environmental document would be required. Whether a later activity is within the scope of a program EIR is a factual question that the lead agency determines based on substantial evidence in the record. Factors that an agency may consider in making that determination include, but are not limited to, consistency of the later activity with the type of allowable land use, overall planned density and building intensity, geographic area analyzed for environmental impacts, and covered infrastructure, as described in the program EIR.

"(3) An agency shall incorporate feasible mitigation measures and alternatives developed in the program EIR into later activities in the program.

"(4) Where the later activities involve site specific operations, the agency should use a written checklist or similar device to document the evaluation of the site and the activity to determine whether the environmental effects of the operation were within the scope of the program EIR.

"(5) A program EIR will be most helpful in dealing with later activities if it provides a description of planned activities that would implement the program and deals with the effects of the program as specifically and comprehensively as possible. With a good and detailed project description and analysis of the program, many later activities could be found to be within the scope of the project described in the program EIR, and no further environmental documents would be required." (CEQA Guidelines, § 15168, subd. (c).)

The City's sole contention on appeal regarding its compliance with CEQA is that no environmental review was required because the Bikeway Project was within the scope of previous program EIRs.

2. *Standard of Review*

"In general, judicial review of agency actions for CEQA compliance extends to 'whether there was a prejudicial abuse of discretion.' [Citations.] 'Abuse of discretion is established if the agency has not proceeded in a

manner required by law or if the determination or decision is not supported by substantial evidence.' ([Pub. Resources Code,] § 21168.5.) . . . [¶]  In a CEQA case, the appellate court's review 'is the same as the trial court's:  [It] reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.'  [Citation.]  The reviewing court independently determines whether the record 'demonstrates any legal error' by the agency and deferentially considers whether the record 'contains substantial evidence to support [the agency's] factual determinations.' "
(*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.)

Case law is clear that courts must apply a substantial evidence standard of review to an agency's conclusion that a project falls within the scope of a previous program EIR.  " 'Once an agency has prepared an EIR, its decision not to prepare a supplemental or subsequent EIR for a later project is reviewed under the deferential substantial evidence standard.  [Citations.] "This rule applies to determinations regarding whether a new EIR is required following a program-EIR level of review." [Citations.]' " (*Latinos Unidos de Napa v. City of Napa* (2013) 221 Cal.App.4th 192, 204, quoting *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 610 (*CREED*).) "Substantial evidence is the proper standard where . . . an agency determines that a project consistent with a prior program EIR presents no significant, unstudied adverse effect." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 174.)

3.  *The Bikeway Project Was Within the Scope of a Previous Program EIR*

The City argues that the Bikeway Project was within the scope of previous program EIRs:  the 2013 program EIR for the San Diego Bicycle

13

Master Plan, and the 2016 program EIR for the North Park Community Plan. We begin our analysis by turning to the two planning documents for which the two program EIRs were created.

The North Park Community Plan (NPCP) was adopted by the City in October 2016. "A component of San Diego's General Plan, the [NPCP] is a guide for how the community will grow and develop over 20 to 30 years." The NPCP contains an extensive discussion of transportation, including the goal of promoting bicycle use and the creation of a bicycle network, as part of "Complete Streets concepts that balance all modes of transportation." "The Community Plan envisions repurposing streets to incorporate multiple modes of travel and parking. By creating an efficient and attractive multi-modal network, people can bicycle, walk, and use transit, which ideally can contribute to less automobile congestion and a more healthy community." One specific policy identified was to "[r]epurpose right[s]-of-way to provide and support a continuous network of safe, convenient, and attractive bicycle facilities, where feasible." The NPCP states that "[t]he development of a well-connected bicycle network with protected bicycle lanes where feasible will help to meet the community's mobility vision." It recognizes that "[t]he construction of additional bicycle facilities that are separated from vehicular traffic could encourage more people to choose bicycles for their preferred mode of travel," but that "[s]eparated facilities require more street space to be implemented." 30th Street was specifically identified as one of the streets on which regional bicycle facilities would be implemented. A map in the NPCP shows 30th Street through North Park as a proposed Class III bikeway (i.e., marked with "sharrows"), but the map indicates that the recommended classifications are subject to revision at implementation.

14

The San Diego Bicycle Master Plan (BMP) was adopted by the City in 2013. It "serves as a policy document to guide the development and maintenance of San Diego's bicycle network, including all roadways that bicyclists have the legal right to use, support facilities, and non-infrastructure programs over the next 20 years." It "provides direction for expanding the existing bikeway network, connecting gaps, addressing constrained areas, improving intersections, providing for greater local and regional connectivity, and encouraging more residents to bicycle more often." The BMP includes a series of maps that show proposed bikeways throughout the City. 30th Street through North Park is shown as a proposed Class II bikeway (i.e., separate bike lanes) or Class III bikeway (i.e., marked with "sharrows"), with one segment shown as only a Class III bikeway. However, the BMP also indicates that the "[p]roposed classifications are expected to be used as a guide and may change at implementation."

The City prepared program EIRs for both the NPCP and the BMP. The issue before us on this appeal is whether the Bikeway Project is within the scope of either of those program EIRs. We therefore focus on each of the program EIRs, in turn, to determine whether the Bikeway Project was within their scope.

a.    *The Program EIR for the North Park Community Plan*

The 2016 program EIR for the NPCP was set forth in a program EIR that also addressed the Golden Hill Community Plan, titled "Final Program Environmental Impact Report for the North Park and Golden Hill Community Plan Updates" (the NPCP Program EIR).

The NPCP Program EIR describes the provisions of the NPCP that deal with bicycle transportation. Among other things, it states, "In order to reduce reliance on fossil fuels and encourage alternative modes of

15

transportation, the proposed [community plan updates] aim to provide a safe and convenient bicycle network that connects community destinations and links to surrounding communities and the regional bicycle network.  In support of this goal, the North Park Mobility Element includes Bicycle Policies ME-1.14 through ME-1.18. . . .  Specifically, implementation of North Park Mobility Element Policy ME-1.14 would support and implement bicycle priority streets and facilities that connect North Park to neighboring communities with emphasis on constructing bikeways in the bicycle network, and implementing and building upon the San Diego Bicycle Master Plan.  In addition, North Park Mobility Element Policy ME-1.16 calls for increasing bicycle comfort and accessibility for all levels of bicycle rides with improvements such as signage, marking, and wayfinding for bicycles, directing them to points of interest within North Park and adjacent communities, actuated by signal timing for bicycles, priority parking for bicycles, wider bike lanes, and—where feasible—separated bicycle facilities." The NPCP Program EIR acknowledges that 30th Street has been identified in the BMP as either a Class II or Class III bikeway, and it contains a map showing 30th Street as having a proposed Class III bikeway, with the caveat that the bikeway classifications may be changed during implementation.

Although the NPCP Program EIR describes the proposed bicycle facilities that are part of the NPCP, we have not located any discussion in the NPCP Program EIR that provides a specific analysis of the *potential environmental impacts* of implementing bicycle facilities in North Park.  Nor has the City identified any such discussion.  The City asserts in its respondent's brief that "the [NPCP] Program EIR analyzed the effect of

16

installing on-street, separated bikeways along 30th Street." However, it provides no record citation to support that statement.[9]

In determining whether a subsequent project is within the scope of a previous program EIR, the inquiry is whether the program EIR " 'contemplates and adequately analyzes the potential environmental impacts of the [subsequent] project' " and whether the subsequent project will "create effects or require mitigation measures that were not discussed in the program EIR." (*Center for Biological Diversity*, *supra*, 234 Cal.App.4th at pp. 238, 239.) Put simply, the question is whether "a project's *potential environmental impacts* were adequately analyzed in a prior program EIR." (*CREED*, *supra*, 134 Cal.App.4th at p. 611, italics added.) Here, because the NPCP Program EIR contains no discussion of the potential environmental impacts of implementing bicycle facilities in North Park, there is no substantial evidence to support a finding that the Bikeway Project was within the scope of the NPCP Program EIR.

b. *The Program EIR for the San Diego Bicycle Master Plan*

The "Bicycle Master Plan Update Final Program Environmental Impact Report" was issued in June 2013 (the BMP Program EIR).[10] Unlike

---

[9] With respect to the need to mitigate any potential impact of the bicycle facilities discussed in the NPCP, the NPCP Program EIR concluded that the NPCP was "*consistent with* adopted policies, plans, or programs supporting alternative transportation," and that "implementation of the proposed [NPCP] and associated discretionary actions *would not . . . conflict with* adopted policies, plans, or programs supporting bicycle facilities." (Italics added.) It therefore concluded that "no mitigation [was] required" to avoid a *conflict* with existing policies or plans. However, that analysis regarding the *consistency* of the bicycle facilities with other policies and plans did not address the *potential environmental impacts* of installing bicycle facilities.

17

the NPCP Program EIR, the BMP Program EIR contains extensive discussion of the potential environmental impacts of installing bicycle facilities in the City. Moreover, the BMP Program EIR repeatedly states its expectation that, because of its scope and the detail of its analysis, no further environmental review would be needed for the implementation of many of the specific future bikeways in the City.

Instead of separately detailing the potential environmental impacts of each specific proposed bikeway in the City, the BMP Program EIR conducted much of its analysis by dividing the types of proposed bikeways into three categories. As it explained, "Because details of individual bicycle-related projects (including defined areas of disturbance) are not known at this time, the level of analysis in this section is programmatic, evaluating the types of impacts to be anticipated for three general categories of future projects: On-street Bikeways With Widening; On-street Bikeways Without Widening; and Off-street Bikeways." The category of On-street Bikeways Without Widening had special significance, as the BMP Program EIR stated that it was "anticipated that many bikeways implemented under the BMP Update categorized as On-street Bikeways Without Widening would be covered by this Program EIR and would not require additional CEQA review[,] since they would only require signage or pavement markings and would not necessitate other roadway modifications."

Here, the Bikeway Project falls into the category of On-street Bikeways Without Widening as defined in the BMP Program EIR. Specifically, the implementation of the Bikeway Project involved the modification of the

---

10    Because the BMP was an update to an earlier bicycle master plan issued in 2002, the BMP Program EIR refers throughout to the BMP as the "BMP Update."

pavement markings on 30th Street and the installation of bollards to separate the bicycle lanes from motorized traffic, but it did not involve the widening of the 30th Street right-of-way.[11]

The BMP Program EIR provides a detailed and extensive discussion of the potential environmental impacts of the implementation of On-street Bikeways Without Widening. Specifically, it meaningfully details the potential environmental impacts in several relevant categories of environmental resources: Biological Resources, Historical Resources, Transportation/Circulation, Visual Quality/Neighborhood Character, Paleontological Resources, and Geologic Conditions.

In this litigation, Save 30th Street's focus is on the potential environmental impacts of the Bikeway Project due to the loss of parking spaces on 30th Street. The BMP Program EIR directly addressed the potential environmental impact due to the loss of parking spaces resulting from implementation of bicycle lanes. In particular, the "Transportation/Circulation" section of the analysis contains the following discussion:

> "The proposed bikeway network would not generate additional motor vehicle trips or result in new land uses, and therefore would not increase the demand for motor vehicle parking.
>
> "For some on-street bikeway projects, however, elimination of some on-street parking (including curb space currently dedicated to yellow commercial vehicle freight loading zones or active

[11] Save 30th Street states in its opening appellate brief that the City admitted that a Class IV bikeway " 'does not fit on the existing curb-to-curb.' " However, the citation it provides is a graphic showing only that a Class IV bikeway would not fit on 30th Street *if all of the parking was maintained*. Save 30th Street has cited nothing in the record to suggest that the 30th Street right-of-way was widened as a result of the Bikeway Project.

passenger loading/unloading zones) could be required to accommodate proposed bikeways. Parking removal associated with bikeway project implementation may potentially result in secondary effects (noise, air quality, traffic congestion, etc.) related to cars circling and looking for a parking space in areas of limited parking supply; this is typically a temporary condition, however, often offset by a reduction in motor vehicle trips due to others who are aware of constrained parking conditions in a given area and by increased use of bicycles instead of motor vehicles. Furthermore, the absence of a ready supply of parking spaces, combined with available alternatives to private motorized vehicle travel (such as bicycles, transit service, taxis, or walking), may induce drivers to shift to other modes of travel, or change their overall travel habits. Long-term operation of bikeway projects implemented under the proposed BMP Update would be expected to have a beneficial effect on parking in many cases, since the program is designed to encourage drivers to leave their vehicles at home and ride bicycles instead, resulting in a reduction in parking demand. [¶] . . . [¶]

"Actions that may be considered to reduce the effects of the loss of on-street parking may include provision of replacement parking, for example, by creating diagonal parking on side streets where the street width would allow."

Based on the portions of the BMP Program EIR we have identified above, that document qualifies as "a sufficiently comprehensive and specific program EIR" (*Center for Biological Diversity*, *supra*, 234 Cal.App.4th at p. 239) for us to conclude, based on substantial evidence, that the Bikeway Project's "potential environmental impacts were adequately analyzed in a prior program EIR" (*CREED, supra*, 134 Cal.App.4th at p. 611). Not only does the BMP Program EIR extensively discuss the potential environmental impacts of On-street Bikeways Without Widening over multiple categories of environmental resources, it also contains a specific discussion of the potential impact caused by the loss of parking spaces due to the installation of a bicycle

lane, which is precisely the impact with which Save 30th Street is concerned.[12]

Accordingly, the City properly determined that it was not required to conduct any further environmental analysis before implementing the Bikeway Project. (CEQA Guidelines, § 15168, subd. (c)(2) ["If the agency finds that . . . no subsequent EIR would be required, the agency can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document would be required."].)[13]

B.    *The City Reasonably Concluded That the Bikeway Project Was Consistent With the NPCP*

---

[12]    At oral argument, counsel for Save 30th Street claimed that the BMP Program EIR was a "broad programmatic EIR" that could not avoid the need for site-specific review of the environmental impacts of adding a Class IV bikeway on 30th Street. But as we have already explained, site-specific review for a later project is not required *unless* it creates effects or requires mitigation measures that were not previously considered. (*Center for Biological Diversity*, *supra*, 234 Cal.App.4th at pp. 238-239; see generally, CEQA Guidelines, § 15168, subd. (c)(5).) No such showing has been made here by Save 30th Street.

[13]    Because we conclude that the City was not required to conduct any environmental review with respect to the Bikeway Project, beyond that already contained in the BMP Program EIR, we find no merit to Save 30th Street's contention that the City improperly committed itself to the Bikeway Project before it conducted any required environmental review. (See *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 138 ["before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' "].)

21

We next consider Save 30th Street's contention that the City's approval of the Bikeway Project violated the Planning and Zoning Law (Gov. Code, § 65000 et seq.) because it was inconsistent with the NPCP.[14]

As applicable here, the Planning and Zoning Law provides that "[n]o local public works project may be approved . . . within an area covered by a specific plan unless it is consistent with the adopted specific plan." (Gov. Code, § 65455;[15] see also *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 998 ["a city's public works projects . . . must be consistent with its general plan"]; *Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 169 ["cities are required to conform proposed public works projects to the general plan"].) The CEQA memo specifically determined that the Bikeway Project was consistent with both the NPCP and the BMP.

We conduct an independent review of the trial court's findings on the issue of consistency. (*Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 19 (*Naraghi Lakes*).) Our review " 'is highly deferential to the local agency, "recognizing that 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory

---

[14]    In the trial court, Save 30th Street also argued that the Bikeway Project was separately inconsistent with the BMP. However, on appeal, Save 30th Street states that because, in its view, the "BMP defers to the NPCP," it views the "principal question" before us to be "whether the [Bikeway] Project is inconsistent with the NPCP." We accordingly focus our consistency analysis on the NPCP.

[15]    After adoption of a general plan, a city may adopt a specific plan for the systematic implementation of the general plan for all or part of the city. (Gov. Code, § 65450.) Both the NPCP and the BMP implement the City's general plan.

22

capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether the [governing body] officials considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.]" ' . . . 'It is, emphatically, not the role of the courts to micromanage these development decisions.' " (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 499 (*Golden Door*).) "Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155.) Moreover, "general and specific plans attempt to balance a range of competing interests. It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. An agency, therefore, has the discretion to approve a plan even though the plan is not consistent with all of a specific plan's policies. It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511.)

Save 30th Street contends that the Bikeway Project is not consistent with the NPCP on several grounds. The arguments fall into two main categories, which we consider in turn.

1. *Bikeway Classifications and Road Designations*

23

We first consider Save 30th Street's contention that the Bikeway Project is inconsistent with the NPCP because it conflicts with certain bikeway classifications and road designations identified in the NPCP.

With respect to bikeway classifications, Save 30th Street contends that because the Bikeway Project was designed as a Class IV bikeway it is inconsistent with the NPCP. Specifically, Save 30th Street points out that a map in the NPCP shows a Class III bikeway on 30th Street (i.e., a bikeway marked with "sharrows"). Save 30th Street's inconsistency argument fails for two reasons.

First, the map in the NPCP expressly indicates that the bikeway designations are subject to change at implementation. Accordingly, the Bikeway Project was not in conflict with the Class III designation, as it was merely tentative.

Second, a review for consistency with a planning document does not focus on *detail*, but on *general policies*. " '[S]tate law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be "*compatible* with the objectives, policies, general land uses, and programs specified in" the applicable plan. [Citation.] The courts have interpreted this provision as requiring that a project be " 'in agreement or harmony with' " the terms of the applicable plan, not in rigid conformity with every *detail* thereof.' " (*Naraghi Lakes*, *supra*, 1 Cal.App.5th at pp. 17-18, second italics added.) "[T]he essential question is 'whether the project is compatible with, and does not frustrate, the general plan's *goals and policies*.' " (*Id.* at p. 18, italics added.) Here, even though the Bikeway Project implements a different *classification* of bike lane from that tentatively indicated on the map in the

24

NPCP, that variation concerns a *detail*, not a goal, objective or policy. Moreover, the City could reasonably conclude that the installation of a Class IV bikeway on 30th Street was consistent with many of the express policies in the NPCP, including, specifically, the policy of implementing a regional bicycle network to include 30th Street, and the policy of implementing separated bicycle lanes where feasible.[16]

Regarding road designations, Save 30th Street also contends the Bikeway Project conflicts with a map in the NPCP which identifies 30th Street as a "2 Lane Collector (continuous left-turn lane)." According to Save 30th Street, the Bikeway Project resulted "in the elimination of the majority of the existing center lane on 30th Street north of Upas Street." The City disputes this characterization, contending that the engineering plans show "the center left-turn lane is maintained on 30th Street at major intersections where vehicles are actually turning off of 30th Street and generally only removed mid-block where there is no opportunity to make a left turn."

---

[16] Among the relevant policies in the NPCP's Mobility Element are as follows: "ME-1.15 Coordinate with SANDAG on the planning and implementation of regional bicycle facilities along Meade Avenue, Howard Avenue, Robinson Avenue, Landis Street, Georgia Street, Park Boulevard, 30th Street, and Utah Avenue. [¶] ME-1.16 Increase bicycle comfort and accessibility for all levels of bicycle riders with improvements such as signage, marking, and wayfinding for bicycles, directing them to points of interest within North Park and adjacent communities, actuated signal timing for bicycles, priority parking for bicycles, wider bike lanes and, where feasible, separated bicycle facilities. [¶] ME-1.17 Repurpose right-of-way to provide and support a continuous network of safe, convenient, and attractive bicycle facilities, where feasible." Finally, the NPCP's Sustainability & Conservation Element contains the following policy: "SE-2.6 Continue to implement General Plan policies related to climate change and support implementation of the CAP through a wide range of actions including: [¶] a. Providing additional bicycle and pedestrian improvements in coordination with street resurfacing as feasible."

We need not resolve this factual dispute to reject Save 30th Street's inconsistency argument. Like the identification of a Class III bikeway on 30th Street, the identification of 30th Street as a two-lane road with a center left-turn lane is *a detail* described in the NPCP, not a goal, objective, or policy. Therefore, Save 30th Street does not establish an inconsistency with the NPCP by pointing to this detail, rather than to a goal, objective, or policy. (*Naraghi Lakes*, *supra*, 1 Cal.App.5th at p. 18 [a project need not be " 'in rigid conformity with every detail' " of a general plan, and the "essential question is 'whether the project is compatible with, and does not frustrate, the general plan's goals and policies' "].) Moreover, to the extent that the center left-turn lane was eliminated on 30th Street as part of the Bikeway Project, the City could reasonably conclude that result was *consistent* with several of the policies in the NPCP's Mobility Element, which favor reconfiguring roads to accommodate bicycles: "ME-3.1 Implement road diets (reduction in number of traffic lanes) or lane diets (narrowing traffic lanes) where appropriate to accommodate transit and bicycles within the existing street right-of-way. [¶] ME-3.2 Provide a Complete Streets network that accommodates multiple modes of transportation throughout the community to accommodate all users of the roadway. [¶] . . . [¶] ME-3.6 Repurpose right-of-way to provide high-quality bicycle, pedestrian, and transit facilities while maintaining vehicular access."

2. *Policies Supporting Access to Businesses and Preserving Parking*

Save 30th Street's second group of arguments focus on the inconsistency of the Bikeway Project with certain policies set forth in the NPCP that favor the promotion of access to businesses and the preservation of parking.

26

Specifically, the NPCP's Mobility Element sets forth the following policies relevant to Save 30th Street's argument: "ME-5.2 Provide on-street parking on all streets to support adjacent uses and enhance pedestrian safety and activity where feasible. [¶] ME-5.3 Include primarily parallel on-street parking on high-volume arterial and collector streets and angled parking on lower-speed and lower-volume streets. [¶] . . . [¶] ME-5.15 Preserve on-street parking in commercial areas to serve short-term shoppers." With respect to the policies favoring access to businesses along 30th Street in general, the NPCP's Land Use Element supports the promotion of "North Park's Community Villages as attractive destinations for living, working, shopping, and entertainment," with one portion of 30th Street identified as part of a "Community Village."

Although Save 30th Street focuses on the policies that favor parking and commercial access to argue that the Bikeway Project is inconsistent with the NPCP, numerous other policies in the NPCP prioritize the promotion of bicycle transportation as part of a balanced transportation system. Among other things, the NPCP states that it "envisions repurposing streets to incorporate multiple modes of travel and parking. By creating an efficient and attractive multi-modal network, people can bicycle, walk, and use transit, which ideally can contribute to less automobile congestion and a more healthy community." The NPCP's Mobility Element identifies the policy of "[r]epurpos[ing] right[s]-of-way to provide and support a continuous network of safe, convenient, and attractive bicycle facilities, where feasible." The NPCP's Economic Prosperity Element identifies the policy of "[i]mprov[ing] pedestrian, bicycle and transit infrastructure in North Park's commercial districts and areas to position North Park as one of the most sustainable communities nationally."

27

As we have explained, " ' " '[b]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes.' " ' " (*Golden Door, supra*, 50 Cal.App.5th at p. 499.)  Here, the City reasonably balanced the competing policies to conclude that the Bikeway Project was consistent with the NPCP.  In approving the Bikeway Project, the City did not completely disregard the policy in favor of preserving on-street parking for commercial and adjacent uses.  As we have noted, "Option A+" was designed to preserve some of the parking that would have been lost in "Option A."  Moreover, the CEQA memo noted that despite the elimination of parking due to the Bikeway Project, parking would still be available to service much of the commercial district because of a preexisting parking garage and because the City had recently undertaken to create additional angled or perpendicular parking on adjacent streets.[17]  In that context, the record supports a finding that the City reasonably used its discretion to balance the competing policies in the NPCP, including the policies in favor of preserving parking, when it approved the Bikeway Project.  Save 30th Street's inconsistency claim is accordingly without merit.

DISPOSITION

The judgment is affirmed.

---

[17]  The creation of angled or perpendicular parking on adjacent streets was consistent with a policy in the NPCP's Mobility Element, which states, "ME-5.1 Encourage and support additional diagonal parking on various side-streets adjacent to the Core area and mixed-use corridors, and within multi-family neighborhoods to increase parking supply where feasible."

IRION, Acting P. J.

WE CONCUR:


DATO, J.


BUCHANAN, J.